## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |
|---|---|
| MARGO PHILLIPS, individually, and on behalf of all others similarly situated, | Case No. 1:15-cv-04301 |
| *Plaintiff*, | Honorable Judge Edmond. E. Chang |
| *v.* |  |
| DOUBLE DOWN INTERACTIVE LLC a Washington limited liability company, |  |
| *Defendant*. |  |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Margo Phillips brings this First Amended Class Action Complaint and Demand for Jury Trial, individually and on behalf of all others similarly situated, against Defendant Double Down Interactive LLC ("Double Down") to enjoin Double Down Casino's operation of unlawful gambling devices. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and upon information and belief, including investigation conducted by her attorneys, as to all other matters.

### NATURE OF ACTION

1.      Defendant Double Down operates a popular virtual casino under the name "Double Down Casino." Defendant presents consumers with a multitude of electronic versions of casino games, such as slot machines, roulette, black jack, and more, and is free to download on Android and Apple iOS devices along with traditional computers.

2.      Defendant provides a bundle of free "chips" to first-time visitors of its virtual casino that can be used to wager on its games. After consumers inevitably lose their initial allotment of chips, Double Down Casino attempts to sell them additional chips starting at $2.99

for 150,000 chips.

3.      Freshly topped off with additional chips, consumers wager to win more. The chips

won by consumers playing Defendant's games of chance are identical to the chips that Defendant

sells. Thus, by wagering 150,000 chips that were purchased for $2.99, consumers have the

chance to win millions of additional chips that they would otherwise have to purchase. Players

that win big can also "cash out" by listing their accounts on the secondary market.

4.      By operating its virtual casino, Defendant has illegally profited from thousands of

Illinois consumers. Accordingly, Plaintiff Margo Phillips, on her own behalf and on behalf of a

Class of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs

and attorneys' fees.

**PARTIES**

5.      Plaintiff Margo Phillips is a natural person and citizen of the State of Illinois.

6.      Defendant Double Down Interactive is a limited liability company incorporated

and existing under the laws of the state of Washington with its principal place of business located

at 605 5th Avenue South #300, Seattle, Washington 98104. Double Down Casino does business

throughout the United States, the state of Illinois, and this District.

**JURISDICTION AND VENUE**

7.      Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because

(a) at least one member of the class is a citizen of a state different from Defendants, (b) the

amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the

exceptions under that subsection apply to this action.

8.      Venue is proper because Defendant conducts business transactions in this District,

the causes of action at issue arose in substantial part in this District, and Plaintiff Phillips resides

2

within this District.

**COMMON FACTUAL ALLEGATIONS**

**I.      Free-to-Play and the New Era of Online Gambling**

9.      The proliferation of internet-connected mobile devices has led to the growth of so-called "free-to-play" videogames. With free-to-play games, developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

10.     The free-to-play model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue and are expected to grow to over $2.4 billion by the end of 2015.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

11.     With free-to-play games of chance, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical

---

[1]      VentureBeat, *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat | Games | by Dean Takahashi*, http://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Apr. 9, 2015).

[2]      *Id.* Indeed, as explained more below, Defendant was purchased by International Game Technology ("IGT")—a leading provider of casino gaming machines—in 2012 for approximately $500 million. *International Game Technology to Acquire Social Gaming Company Double Down Interactive | IGT News Room*, http://www.igt.com/ company-information/news-room/news-releases.aspx?NewsID=1647893 (last visited Apr. 9, 2015).

collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

12.     Another stated:

"Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

13.     The comparison to land-based casinos doesn't end there. Just as with casino operators, free-to-play developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

14.     Game Informer, another respected videogame magazine, reported on the rise (and danger of) of micro-transactions in free-to-play games and concluded:

"Many new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

---

[3]     PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 9, 2015).

[4]     The Badger, *Are micro-transactions ruining video games? | The Badger*, http://www.badgeronline.co.uk/micro-transactions-ruining-video-games/ (last visited Apr. 9, 2015).

[5]     *Id.* (emphasis added).

[6]     Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-

15.    Academics have also studied the socioeconomic effect free-to-play games have on

consumers. In one study, the authors compiled several sources analyzing free-to-play games of

chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."
>
> …
>
> "According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

16.    The same authors looked at the link between playing free-to-play games of chance

and gambling in casinos. They stated that "[prior] research indicated that winning large sums of

virtual credits on social casino gaming sites was a key reason for [consumers'] migration to

online gambling," yet the largest predictor that a consumer would transition to online gambling

was "micro-transaction engagement." In fact, "the odds of migration to online gambling were

---

microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited Apr. 9, 2015).

[7]    Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

17.     The similarity between free-to-play games of chance and games of chance found in casinos has led governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendant's Double Down Casino has thrived, and thousands of consumers have lost millions of dollars unwittingly playing Defendant's unlawful games of chance.

**II.     A Brief Introduction to Defendant Double Down.**

18.     Defendant Double Down operates an online casino called "Double Down Casino." Defendant's Double Down Casino is available for consumers to play through Facebook, and on mobile devices such as Android phones or Apple iPhones. Defendant's casino is very popular—over six million people play at the casino every month.

19.     Defendant markets its casino as "the FULL casino experience," that has "authentic SLOTS such as Wheel of Fortune[TM], Wolf Run[TM], DaVinci Diamonds[TM] and Cleopatra®." *See* **Figure 1**.

---

[8]     *Id.*

[9]     In late August 2014, South Korea began regulating "social gambling" games, including games similar to Double Down Casino, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, http://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Apr. 9, 2015). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

### Description

DoubleDown Casino brings the FULL casino experience everywhere you go. Experience Vegas, anytime, anywhere with BLACKJACK, VIDEO POKER, and authentic SLOTS such as Wheel of Fortune™, Wolf Run™, DaVinci Diamonds™ and Cleopatra®

DoubleDown Casino is the world's largest virtual casino with nearly 50 different, world-class, authentic slots—all for free! Absolutely no locked content!

Daily Spins give you up to $2,000,000 bonus chips 365 days a year!

Double down and play our newest game, Roulette!

Get in on the action with GAME KING™ Video Poker - the most popular Video Poker found in all land-based casinos.

With new games added each week, join the millions of players who are already winning!

Key Features:
· Over 45+ Slot Games, including authentic games from the Casino floor
· Player's Suite BLACKJACK
· Daily Slot Tournaments with Progressive Jackpots
· The #1 Video Poker: GAME KING™ Video Poker
· FREE to Play, Every Day!
· Login with Facebook, or play the full game as a Guest
· Invite friends, send FREE Chips, and find something NEW every week

**(Figure 1.)**[10]

20.     In 2012, Double Down was purchased by IGT for approximately $500 million.[11] IGT is one of the largest designers and manufactures of traditional gambling games, such as video poker and electronic slot machines. In purchasing Double Down Casino, IGT sought to supplement its traditional gaming products with mobile offerings. In doing so, IGT sought to take its real-world gaming products and transfer them to the mobile medium. IGT demonstrated as much when it announced its purchase of Double Down by stating:

> "The addition of Double Down provides IGT instant size and scale in the fast growing world of casino-style social gaming and is expected to broaden IGT's popular gaming titles [*e.g.*, IGT's "Wheel of Fortune" slot machine] beyond the physical casino to Facebook, the world's largest social network with over 800 million global users. This powerful distribution model is anticipated to provide IGT an opportunity to entertain players with consistent, ubiquitous, thrilling gaming experiences across multiple platforms."

21.     IGT described Double Down Casino in its periodic SEC filings as its "North America based online social gaming casino" that "generates revenues from the sale of virtual

---

[10]     *DoubleDown Casino - FREE Slots - Android Apps on Google Play*, web.archive.org/web/20150228152823/https://play.google.com/store/apps/details?id=com.ddi&hl=en (last visited July 2, 2015).

[11]     *International Game Technology to Acquire Social Gaming Company Double Down Interactive | IGT News Room*, http://www.igt.com/company-information/news-room/news-releases.aspx?NewsID=1647893 (last visited Apr. 9, 2015).

casino chips to players for use within the Double Down Casino for additional play."[12] IGT continued, stating that, from an accounting standpoint, it and Defendant recognize "revenue" generated from the sale of chips to consumers. They also recognize "bookings" which include "deferral adjustments based on the estimated period of service or chip consumption[.]" (*i.e.*, Defendant ascribes a value to, and accounts for, chips that have been purchased or won but have not yet been wagered and lost).[13]

22. IGT also touted that "our land-based casino customers can integrate the Double Down Casino link [that lets players play at the virtual casino] into their own website providing players with access to a large portfolio of popular social casino-style games. The Double Down Casino link provides casino operators with an opportunity to engage players when they are not physically present in the land-based casino." Indeed, those "land-based casino" operators not only get player "engagement," but also profit—Double Down Casino pays a share of its profits to those casinos based on a "revenue participation basis."[14]

23. Defendant's Double Down Casino has been immensely profitable. In 2014, Defendant saw revenues of over $240 *million* from the sales of online chips in its videogame. However, as explained more below, Defendant's Double Down Casino games are nothing more than camouflaged unlawful games of chance.

## III. Defendant's Virtual Casino Contains Unlawful Games of Chance.

24. Consumers visiting Defendant's virtual casino for the first time are awarded one million free "chips." Ostensibly, Defendant gives away one million chips to each consumer to

---

[12]     *Form 10-K* (Sept. 30, 2014), http://services.corporate-ir.net/SEC/Document.Service?id=P3VybD1hSFIwY0RvdkwyRndhUzUwWlc1cmQybDZZWEprTG1OdmJTOWtiM2R1Ykc5aFpDNXdhSEEvWVddOMGFXOXVQVkJFUmlacGNHHRm5aVDA1T1RJeE9UVTJKKbk4xWW5OcFpEMEFOODz09JnR5cGU9MiZmbj05OTIxOTU2LnBkZg==.
[13]     *Id.* at 7.
[14]     *Id.* at 10.

ensure that they "buy in" to Defendant's casino over alternatives.

25.     After they begin playing, they quickly lose their initial allotment of chips. Immediately thereafter, Defendant informs them via a "pop up" screen that they have "INSUFFICIENT FUNDS TO SPIN" and prevents them from additional play. *See* Figure 2.



(**Figure 2**, showing Defendant's "Double Diamond Wheel of Fortune" slot machine.)

26.     Concurrently with that warning, Double Down Casino causes another screen to pop up for its electronic store where it sells chips starting at prices of $3.00 ($2.99 on mobile devices) for 150,000 chips to $99.00 for 100,000,000 chips. *See* Figure 3.



(**Figure 3**, showing Defendant's online store that sells chips for cash.)

27.     The decision to sell chips by the thousands isn't an accident. Rather, Defendant attempts to lower the perceived cost of the chips (costing just a fraction of a penny per chip) while simultaneously maximizing the perceived value of the award (awarding millions of chips in jackpots), further inducing consumers to bet on its games.

28.     To begin wagering, players select the "coin value" (*i.e.*, bet or wager) that will be used for a spin, as illustrated in Figure 2 (which shows one of Defendant's games). Defendant also designed certain of its games to allow consumers to multiply the bet's "coin value" by a number of "lines" (*i.e.*, combinations) on which the consumer can win, shown in Figure 4 below as the "1 LINE + BONUS" field.



(**Figure 4.**)

29.     The bet amount multiplied by the number of lines comprises the "TOTAL BET." In the example shown in Figure 4, the player is attempting to bet "$48,000" in chips, or approximately $0.96, for one spin of the slot machine.

30.     Once a consumer spins the slot machine by pressing a button (shown in Figure 4 as the grey, circular arrow), none of Defendant's games allow (or call for) any additional user action. Instead, the consumer's computer or mobile device communicates with and sends information (such as the "TOTAL BET" amount) to Defendant's servers. Defendant's servers then execute the game's algorithms that determine the game's outcome. Notably, none of Defendant's games depend on any amount of skill to determine their outcomes—all outcomes are based entirely on chance.

31.     Figure 5 shows the outcome of a spin where the player won 128,000 chips, an

approximate value of $2.56 (or roughly seven additional plays), from a 12,000-chip bet.



(**Figure 5.**)

32.     In addition to their inherent value, the chips also grant consumers the immediate

right to replay. But, players can also pause the game and continue play at a later time to wager

the chips they previously won.

33.     Indeed, Defendant created Double Down Casino to lock consumers into

continuous gambling sessions. Double Down Casino is unlike previous gambling devices

wherein consumers gamble and leave the device (*e.g.* by leaving a casino and going home) after

some time to conclude a single gambling transaction. Instead, consumers begin a Double Down

Casino gambling session when they download the app (or, for example, play via Facebook), the

session continues when they obtain batches of free chips from Defendant, wager at the casino,

and purchase additional chips when their supply is exhausted.

34.     The Double Down Casino chips are also valuable because consumers can cash out

by listing their accounts on the secondary market. In one example, a Double Down Casino player

11

listed his account for sale for approximately $165.[15] Moreover, in its public filings, Defendant's parent company, IGT, accounts for the value of the chips as "bookings," which account for the future value of the chips *after* consumers purchase them and *while* the chips are maintained in consumers' accounts.

35.     Once Defendant's algorithms determine the outcome of the spin and display it to the consumer, Defendant adjusts the balance of the consumer's account accordingly. On each spin, the player risks the balance of their wager because they can obtain an outcome where they win no chips or fewer chips than their wager. Similarly, on each spin, Defendant faces the risk that the outcome of the spin will award the player a number of chips in excess of the player's wager, meaning Defendant must account for future plays, the loss of a purchase for additional chips, and the continued "deferral" of chips included in its "bookings."

36.     Defendant keeps records of each wager, outcome, and win for every Double Down Casino player. Defendant even allows players to view their total winnings or losses from Defendant's casino. *See* Figure 6. Defendant's records maintain the value of the chips consumers purchased, received, and won because until consumers wager and lose their chips, consumers are able to use the recorded chips for additional wagers, are able to avoid purchasing additional chips at cost, and are able to sell the chips on the secondary market.

---

[15]     *Cheap chips: Selling Lucky Gem, Doubledown, Doubleu, Lucky Slots: Facebook*, http://bitcointalk.org/index.php?topic=141459.0 (last visited Feb. 10, 2015) (Bitcoin to USD exchange rate as of Feb. 10, 2015).



(**Figure 6**, showing a part of Defendant's accounting system.)

37.     In addition, Defendant regularly performs "historical data analysis" on how "chips are consumed" (*i.e.*, how they're wagered) in its games of chance.[16] That is, Defendant tracks the time it takes consumers to exhaust their supply of purchased chips by betting at Defendant's games of chance, likely in an attempt to improve ways it can induce consumers to buy and wager additional chips.

## FACTS SPECIFIC TO PLAINTIFF PHILLIPS

38.     In or around January 2013, Plaintiff Phillips began playing Double Down Casino through her Facebook account. After Plaintiff lost the balance of her initial allocation of free chips, Plaintiff Phillips began purchasing chips from Double Down Casino.

39.     Thereafter, Plaintiff Phillips continued playing various slots and roulette games within Defendant's casino where she would wager chips for the chance of winning additional chips. From January 2013 to April 2015, Plaintiff Phillips wagered and lost (and Defendant Double Down won) over $1,000 by playing Defendant's games of chance. For example, on March 7, 2015, Plaintiff Phillips paid $59.00 to Defendant to convert dollars into 35,000,000 chips, which she subsequently lost.

---

[16]     *See* Form 10-K, *supra* n. 12.

13

## CLASS ALLEGATIONS

40. **Class Definition:** Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and a class defined as follows:

> **Class:** All individuals domiciled in the State of Illinois who lost $50 or more to Defendant wagering at Defendant's Double Down Casino through the date of entry of any judgment in favor of the Class in this case.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

41. **Numerosity:** On information and belief, thousands of consumers fall into the definition of the Class.[17] Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

42. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class and Defendant has no defenses unique to Plaintiff. Moreover, Plaintiff's counsel are well-

---

[17]     According to IGT's recent 2014 10-K SEC filing, more than 1.7 million consumers play Double Down Casino everyday and spend over $700,000 buying chips to spend on wagers. Form 10-K, *supra* n.12. As such, thousands of Illinois consumers undoubtedly fall into the definition of the Class.

respected members of the legal community, have regularly engaged in major complex litigation, and have had extensive experience in consumer class actions involving issues of similar size, scope, and complexity as the present case.

43. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff's and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

44. **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff's and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

(a) Whether Defendant's virtual casino games are "gambling devices" as defined by ILCS 5/28-2(a);

(b) Whether Plaintiff and members of the Class lost by gambling any sum of money or thing of value to Defendant;

(c) Whether Defendant is a "winner" of Plaintiff Phillips's and the Class's monies or things of value;

(d) Whether Defendant's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act**,** 815 ILCS §§ 505/1, *et seq.*; and

(e) Whether Defendant has unjustly received money belonging to Plaintiff and the Class, and whether, under principles of equity and good conscience, Defendant should not be permitted to retain it.

45. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the

Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same.

46.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

47.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION
### The Illinois Loss Recovery Statute
### (720 ILCS 5/28-8(a))
### (On Behalf of Plaintiff and the Class)

48.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

49.     Plaintiff Phillips, members of the Class, and Defendant are each a "person" within the meaning of 720 ILCS 5/28-8(a).

50.     Defendant's virtual casino games featured in its Double Down Casino are gambling devices as defined by 720 ILCS 5/28-2(a), because they are devices designed for the reception of money or other things of value on chance or upon the action of which money or other things of value are staked, hazarded, bet, won or lost.

51.     As described in Section III, above, Defendant designed the casino games featured in its Double Down Casino to encourage players to wager chips for a chance to win additional chips, which are things of value. Moreover, Defendant designed the casino games featured in its Double Down Casino whereby a press of the "spin" (or similar) buttons causes chips (which were purchased in the Double Down casino with money) to be debited from consumers' accounts.

52.     Defendant's chips are things of value because Double Down attributes value to the chips, it sells millions of dollars of chips each year, it awards chips that grant additional plays of Defendant's games of chance (which would otherwise cost money), and/or consumers can buy and sell Double Down Casino accounts on the secondary market to cash out. *See* Section III.

53.     Defendant's casino games featured in its Double Down Casino are games of chance because a "spin" (or other similar function) results in the award of things of value based upon pre-determined odds of winning. Defendant programmed its casino games to award a

17

varying number of chips (or no chips at all) based upon a pre-programmed algorithm that determines the likelihood of winning. After a consumer presses the "spin" button, Defendant does not take or require any input from the consumer to award the prize. The outcome of the spin is determined entirely by chance and not by any action or skill on the part of the consumer. As such, Defendant's casino games are not contests of skill.

54. Plaintiff Phillips and each member of the Class is a "loser" because they each purchased and then wagered chips playing at Defendant's casino games found within its Double Down Casino. In addition, Plaintiff Phillips and the members of the Class had the value of their wagers deducted from their accounts concurrently with a spin. In total, Plaintiff Phillips and each member of the Class have each lost $50 or more from wagering at Defendant's virtual casino games.

55. Defendant created Double Down Casino to lock consumers into continuous gambling sessions. Double Down Casino is unlike previous gambling devices wherein consumers gamble and exit after some time to conclude one gambling transaction. Consumers begin a Double Down Casino gambling session when they download the app (or, for example, play via Facebook), and the session continues when they obtain batches of free chips from Defendant, wager at the casino, and purchase additional chips when their supply is exhausted.

56. Defendant is a "winner" because it participates in the games of chance and has a direct stake in the outcome of the gambling.[18] Specifically, Defendant developed Double Down Casino, programmed the functionality for each of its virtual casino games (including the

---

[18]     Statements in IGT's 10-K filings further support that Double Down is the winner of Plaintiff's and the Class's losses. IGT states, "DoubleDown is the principal, responsible for substantially all aspects of the casino services and sale of virtual goods to the player." Form 10-K, *supra* n.12.

algorithms that determine the chance of winning chips), provides access to the virtual casino games, and obtains all of the money that consumers lose wagering at its games of chance.

57. Plaintiff Phillips and the members of the Class delivered chips and money to Defendant through the Double Down Casino. That is, Defendant authored an electronic method of converting money to chips and programmed Double Down Casino to deduct chips from Plaintiff's and the members of the Class's accounts concurrently with a spin.

58. Plaintiff Phillips's and each Class member's losses occurred in Illinois because Defendant's Double Down Casino virtual casino operated on computers (*i.e.,* within browser windows on a home PC) and devices (*e.g.*, on iPhone and iPad devices) within the State of Illinois. As such, Defendant caused such devices in Illinois to operate as discrete terminals for Defendant's gambling devices.

59. As a direct and proximate result of Defendant's operation of the gambling devices, Plaintiff Phillips and each member of the Class have lost $50 or more. Plaintiff Phillips, on behalf of herself and the Class, seeks an order (1) requiring Defendant to cease the operation of its gambling devices, and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

**SECOND CAUSE OF ACTION**
**The Illinois Loss Recovery Statute**
**(720 ILCS 5/28-8(a))**
**(In the Alternative to the First Cause of Action)**
**(On Behalf of Plaintiff and the Class)**

60. Plaintiff incorporates the allegations contained in Paragraphs 1 through 47 as if fully set forth herein.

61. Plaintiff Phillips, members of the Class, and Defendant are each a "person" within the meaning of 720 ILCS 5/28-8(a).

62.     Defendant's virtual casino games featured in its Double Down Casino are gambling devices as defined by 720 ILCS 5/28-2(a) because they are devices designed for the reception of money or other things of value on chance or upon the action of which money or other things of value are staked, hazarded, bet, won or lost.

63.     As described in <u>Section III</u>, above, Defendant designed the casino games featured in its Double Down Casino to encourage players to wager chips for a chance to win additional chips, which are things of value. Moreover, Defendant designed the casino games featured in its Double Down Casino whereby a press of the "spin" (or similar) buttons causes chips (which were purchased in the Double Down casino with money) to be debited from consumers' accounts.

64.     Defendant's chips are things of value because Double Down attributes value to the chips, it sells millions of dollars of chips each year, it awards chips that grant additional plays of Defendant's games of chance (which would otherwise cost money), and/or consumers can buy and sell Double Down Casino accounts on the secondary market to cash out. *See* <u>Section III</u>.

65.     Defendant's casino games featured in its Double Down Casino are games of chance because a "spin" (or other similar function) results in the award of things of value based upon pre-determined odds of winning. Defendant programmed its casino games to award a varying number of chips (or no chips at all) based upon a pre-programmed algorithm that determines the likelihood of winning. After a consumer presses the "spin" button, Defendant does not take or require any input from the consumer to award the prize. The outcome of the spin is determined entirely by chance and not by any action or skill on the part of the consumer. As such, Defendant's casino games are not contests of skill.

66.     Plaintiff Phillips and each member of the Class is a "loser" because they each

purchased and then wagered chips playing at Defendant's casino games found within its Double Down Casino. In addition, Plaintiff Phillips and the members of the Class had the value of their wagers deducted from their accounts concurrently with a spin. In total, Plaintiff Phillips and each member of the Class have each lost $50 or more from wagering at Defendant's virtual casino games within the six months preceding the filing of this Complaint.

67.     Defendant is a "winner" because it participates in the games of chance and has a direct stake in the outcome of the gambling.[19] Specifically, Defendant developed Double Down Casino, programmed the functionality for each of its virtual casino games (including the algorithms that determine the chance of winning chips), provides access to the virtual casino games, and obtains all of the money that consumers lose wagering at its games of chance.

68.     Plaintiff Phillips and the members of the Class delivered chips and money to Defendant through the Double Down Casino. That is, Defendant authored an electronic method of converting money to chips and programmed Double Down Casino to deduct chips from Plaintiff's and the members of the Class's accounts concurrently with a spin.

69.     Plaintiff Phillips's and each Class member's losses occurred in Illinois because Defendant's Double Down Casino virtual casino operated on computers (*i.e.,* within browser windows on a home PC) and devices (*e.g.*, on iPhone and iPad devices) within the State of Illinois. As such, Defendant caused such devices in Illinois to operate as discrete terminals for Defendant's gambling devices.

70.     As a direct and proximate result of Defendant's operation of the gambling

---

[19]     Statements in IGT's 10-K filings further support that Double Down is the winner of Plaintiff's and the Class's losses. IGT states, "Double Down is the principal, responsible for substantially all aspects of the casino services and sale of virtual goods to the player." Form 10-K, *supra* n.12.

devices, Plaintiff Phillips and each member of the Class have lost $50 or more. Plaintiff Phillips, on behalf of herself and the Class, seeks an order (1) requiring Defendant to cease the operation of its gambling devices, and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

**THIRD CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS §§ 505/1, *et seq.*)**
**(On Behalf of Plaintiff and the Class)**

71.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS §§ 505/1, *et seq.*) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

73.     The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

74.     The ICFA applies to Defendant's actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

75.     Defendant is a "person" as defined under section 505/1(c) of the ICFA.

76.     Plaintiff and each member of the Class are "consumers" as defined under section 505/1(e) of the ICFA.

77.     Defendant's Double Down Casino chips are "merchandise" within the meaning of section 505/1(b) and the sale of the chips is considered "trade" or "commerce" under the ICFA.

78.     Defendant's practices, as described above (including Defendant's operation of the

Double Down Casino and inducement of consumers to purchase chips for use at the unlawful games of chance), were unfair within the meaning of the act because they offended Illinois' public policy against unlawful and unregulated gambling and were otherwise unethical, oppressive and unscrupulous and caused substantial injury to the consumers who purchased chips in Double Down Casino.

79.     Defendant caused substantial injury to consumers by inducing them to purchase chips by and through the design of their Double Down Casino. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

80.     Defendant's unfair practices occurred during the marketing and sale of their Double Down Casino chips, and therefore, occurred in the course of trade and commerce.

81.     Plaintiff enjoys playing virtual slot machines and is continuously in the market for lawful virtual slot machine games. As such, she is likely to continue to encounter Defendant's unlawful Double Down Casino absent injunctive relief

82.     As a direct and proximate result of Defendant's violation of the ICFA, Plaintiff and each Class member have suffered harm in the form of monies paid for Defendant's Double Down Casino chips. Plaintiff, on behalf of herself and the Class, seeks an order (1) requiring Defendant to cease the unfair practices described herein; (2) awarding damages, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable; and/or (3) requiring Defendant to restore to Plaintiff and each Class member any money acquired by means of unfair practices (restitution).

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

83.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

84.     Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of chips to wager in Defendant's Double Down Casino.

85.     Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

86.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendant has unjustly obtained as a result of its unlawful operation of casino games. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

87.     Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Phillips, on behalf of herself and members of the Class, prays for the following relief:

a.      Certify this case as a class action on behalf of the Class as defined above and appoint Margo Phillips as Class representative and her undersigned attorneys as Class Counsel;

b.      Enter judgment against Defendant, in the amount of the losses suffered by Plaintiff Phillips and each member of the Class and/or three times their losses where appropriate;

c.      Enter judgment against Defendant for monetary, actual, consequential, and compensatory damages caused by their unfair conduct;

Case: 1:15-cv-04301 Document #: 18 Filed: 07/02/15 Page 25 of 26 PageID #:149

d.      Award Plaintiff and the members of the Class reasonable costs and attorneys'

fees;

e.      Award Plaintiff and the members of the Class pre- and post-judgment interest;

f.      Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to

protect the interests of Plaintiff and the members of the Class; and

g.      Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully Submitted,

**MARGO PHILLIPS**, individually and on behalf of
all others similarly situated,

Dated: July 2, 2015           By: /s/ Benjamin H. Richman
                                One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Amir C. Missaghi
amissaghi@edelson.com
Courtney C. Booth
cbooth@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## <u>CERTIFICATE OF SERVICE</u>

I, Benjamin H. Richman, an attorney, hereby certify that on July 2, 2015, I served the above and foregoing ***First Amended Class Action Complaint and Demand for Jury Trial***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Benjamin H. Richman
_____
