**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

MARGO PHILLIPS, individually, and on
behalf of all others similarly situated,

                    *Plaintiff*,

        *v.*

DOUBLE DOWN INTERACTIVE LLC, a
Washington limited liability company,

                    *Defendant*.

Case No. 1:15-cv-04301

Honorable Edmond E. Chang

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................1

**BACKGROUND** .................................................................................................3

**I.**     **THE DOUBLE DOWN CASINO** ...............................................................3

**II.**    **PLAINTIFF USED AND LOST MONEY TO DOUBLE DOWN IN ITS DOUBLE DOWN CASINO** ....................................................................4

**ARGUMENT** ....................................................................................................5

**I.**     **LEGAL STANDARD** .............................................................................5

**II.**    **PHILLIPS PROPERLY PLEADS HER CLAIMS FOR RECOVERY UNDER THE ILLINOIS LOSS RECOVERY STATUTE** ...........................................5

       **A.**     **Defendant's Casino Games are Illegal** ..........................................5

            *i.*     *Chips are Things of Value* .................................................7

            *ii.*    *The Application is a Device* ..............................................9

       **B.**     **Defendant is a "Winner" Under the Statute** ..............................12

            *i.*     *Defendant Has a Direct Stake in the Illegal Gambling* .............13

            *ii.*    *Defendant Risks its Own Money Through Double Down Casino* .............14

       **C.**     **Phillips And The Putative Class Lost Money To Defendant Through Its Casino** ..........................................................16

            *i.*     *Plaintiff Adequately Pleads Loss* ......................................18

            *ii.*    *Counts I and II of the FAC are Not Duplicative* ....................19

**III.**   **PLAINTIFF PROPERLY PLEADS A CLAIM FOR VIOLATION OF THE ICFA** ....................................................................19

**IV.**    **PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT LIKEWISE SURVIVES** ..................................................................22

**CONCLUSION** ................................................................................................23

## TABLE OF AUTHORITIES

**United States Supreme Court Cases:**

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008).................................................................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................5

*Sebelius v. Cloer*,
    133 S. Ct. 1886 (2013)..............................................................................11

*United States v. Hartwell*,
    73 U.S. 385 (1867)............................................................................10, 17

*United States v. Hood*,
    343 U.S. 148 (1952)..................................................................................10

*Yates v. U.S.*,
    135 S. Ct. 1074 (2015)..............................................................................11

**United States Court of Appeals Cases:**

*Batson v. Live Nation Entm't, Inc.*,
    746 F.3d 827 (7th Cir. 2014) ....................................................................20

*Cleary v. Philip Morris Inc.*,
    656 F.3d 511 (7th Cir. 2011) ....................................................................22

*In re MasterCard Int'l Inc.*,
    313 F.3d 257 (5th Cir. 2002) ....................................................................15

*Modernistic Candies v. Fed. Trade Comm'n*,
    145 F.2d 454 (7th Cir. 1944) ....................................................................21

*Pisciotta v. Old Nat'l Bancorp*,
    499 F.3d 629 (7th Cir. 2007) ......................................................................5

*TRW Title Ins. Co. v. Security Union Title Ins. Co.*,
    153 F.3d 822 (7th Cir. 1998) ....................................................................22

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ........................................20

**United States District Court Cases:**

*1756 W. Lake St., LLC v. Am. Chartered Bank*,
    No. 14-cv-1869, 2014 WL 5073354 (N.D. Ill. Oct. 9, 2014) ........................................8–9

*Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*,
    787 F. Supp. 2d 747 (N.D. Ill. 2011) ........................................21

*Carlson v. Nielsen*,
    No. 13-cv-5207, 2014 WL 4771669 (N.D. Ill. Sept. 24, 2014) ........................................19

*Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*,
    545 F. Supp. 2d 768 (N.D. Ill. 2008) ........................................21

*Fahrner v. Tiltware LLC*,
    No. 13-cv-0227, 2015 WL 1379347 (S.D. Ill. Mar. 24, 2015) ........................................15, 16, 17

*Hill v. Wells Fargo Bank, N.A.*,
    946 F. Supp. 2d 817 (N.D. Ill. 2013) ........................................20

*Humphrey v. Viacom, Inc., et al.*,
    No. 06-cv-2768, 2007 WL 1797648 (D.N.J. June 20, 2007) ........................................17

*Langone v. Kaiser*,
    No. 12-cv-2073, 2013 WL 5567587 (N.D. Ill. Oct. 9, 2013) ........................................12, 15, 16, 17

*Manning v. Creative Headquarters, LLC*,
    No. 11-cv-02203 (N.D. Ill. Mar. 30, 2012) ........................................15

*Parker v. EMC Mortgage Corp.*,
    No. 11-cv-05682, 2014 WL 7205474 (N.D. Ill. Dec. 18, 2014) ........................................20

*Romo v. Fed. Nat'l Mortgage Ass'n*,
    No. 14-cv-1891, 2014 WL 5620157 (N.D. Ill. Nov. 4, 2014) ........................................21

*Sonnenberg v. Oldford Group, Ltd.*,
    No. 13-cv-0344, 2015 WL 1379505 (S.D. Ill. March 24, 2015) ........................................13, 15, 16, 17

*United States v. Jacobs*,
    116 F. Supp. 928 (N.D. Ill. 1953) ........................................10, 17

**State Court Cases:**

*Almy Mfg. Co. v. City of Chicago,*
    202 Ill. App. 240 (Ill. App. Ct. 1st Dist. 1916)................................................................9,10

*Holmes v. Brickey,*
    335 Ill. App. 390 (Ill. App. Ct. 3d Dist. 1948)................................................................5

*Moushon v. AAA Amusement, Inc.,*
    267 Ill. App. 3d 187 (Ill. App. Ct. 4th Dist. 1994) ........................................................13

*Pearce v. Foote,*
    113 Ill. 228 (Ill. 1885)................................................................13

*People v. One Mach. Known as "Circus Days",*
    23 Ill. App. 2d 480 (Ill. App. Ct. 2d Dist. 1960).....................................................6, 8, 12

*People v. One Mech. Device,*
    11 Ill. 2d 151 (Ill. 1957)................................................................7, 8

*People v. One Pinball Mach.,*
    316 Ill. App. 161 (Ill. App. Ct. 2d Dist. 1942)....................................................9, 11, 12

*People v. One Slot Mach. Owned by Telequiz Corp.,*
    344 Ill. App. 379 (Ill. App. Ct. 2d Dist. 1951)........................................................9, 10

*Playboy Hotel of Chicago, Inc. v. City of Chicago,*
    147 Ill. App. 3d 984 (Ill. App. Ct. 1st Dist. 1986) ........................................................11

*Reuter v. Mastercard Int., Inc.,*
    397 Ill. App. 3d 915 (5th Dist. App. 2010)..............................................................14, 15

*Robinson v. Toyota Motor Credit Corp.,*
    201 Ill. 2d 403 (Ill. 2002)................................................................20

*Zeller v. White,*
    106 Ill. App. 183 (Ill. App. Ct. 2d Dist. 1902)........................................................12, 19

**Miscellaneous:**

720 ILCS 5/28 ................................................................ *passim*

815 ILCS 505/1 ................................................................1, 19, 20, 22

Black's Law Dictionary (8th ed. 2004) ................................................................9

Device, Dictionary.com, *available at* http://dictionary.reference.com/browse/device ..................9

Fed. R. Civ. P. 8 ....................................................................................................................19

## INTRODUCTION

Defendant Double Down Interactive LLC ("Double Down" or "Defendant") owns and operates the wildly popular and profitable virtual casino aptly-named "Double Down Casino," which allows individuals to play a multitude of electronic casino games, such as slot machines, roulette, and blackjack. In order to play, users purchase "Chips" from Double Down and wager within the various casino games in hopes of receiving additional Chips that can either be used for future wagers or sold for actual currency on secondary markets. It turns out, however, that this seemingly benign game of chance actually constitutes an unlawful gambling device under Illinois law, thus entitling players of the games to recoup the monies they have lost playing and to other relief.

Plaintiff Margo Phillips ("Phillips" or "Plaintiff") is one such consumer that fell victim to Defendant's unlawful casino games, losing more than $1,000 in its games of chance. In response, Phillips brought the instant action on behalf of herself and a class of similarly situated individuals (the "Class") in an effort to recoup funds that were unlawfully obtained by Defendant as a result of its alleged conduct. In her complaint, Phillips asserts causes of action for (1) recovery under the Illinois Loss Recovery Statute, 720 ILCS 5/28-8 ("ILRS"),[1] (2) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA"), and (3) unjust enrichment. Defendant now seeks dismissal of each of Plaintiff's claims, raising a handful of often repeated but ultimately unavailing arguments.

First, Defendant argues that Plaintiff fails to sufficiently plead a claim pursuant to 720 ILCS 5/28-2, because the Chips wagered are not "things of value" and the Casino is not a gambling device. Both arguments fail. The Chips are things of value inasmuch as they (i) are

---

[1]  Plaintiff refers to Article 28 of the Illinois Criminal Code (720 ILCS 5/28 *et seq.*), which governs gambling related offenses and many facets of Plaintiff's claims, as the "Act" for purposes of brevity and clarity throughout her opposition.

valued by Defendant upon their sale and consumption, (ii) allow for individuals to make future wagers, and (iii) may be sold on the secondary market for real currency. Further, because the Casino allows individuals to wager these "things of value," it constitutes an illegal gambling device—not to mention, is an actual slot machine that operates upon the insertion of (and pays out) Chips. And the fact that the Casino is an intangible piece of software does not change that.

Moreover, even if there was an ambiguity under the statute regarding Double Down Casino's status as a gambling device (there is not), the Court would still be bound by the legislative intent behind the Act, which is to prevent and stifle illegal gambling. Indeed, it should go without saying that by enforcing the ILRS against Double Down, the Court would limit both the nature and scope of its illegal gambling activities.

Beyond that, Double Down's motion to dismiss is based primarily on the mistaken premise that its Double Down Casino does not allow Class members to lose, or itself to win, things of value and therefore, that its conduct cannot constitute "illegal gambling." Double Down is wrong. Because Double Down directly participates in and risks its own money in each wager made in the Casino, it stands to win. Of course, if it stands to win, Plaintiff and the Class likewise stand to lose, as Defendant collects their wagers (which were purchased with real-world currency).

For its final arguments against Plaintiff's ILRS claims, Defendant contends that Plaintiff did not adequately plead her "loss" and that either Count I or Count II must be dismissed as duplicative. Both of those arguments also miss their mark. First, Plaintiff alleged that she purchased, wagered, and lost at least $1,000 total (and more than $59 in the six months preceding this action) to Defendant within its Casino. And Counts I and II are not duplicative— they are based on distinct legal theories and pled in the alternative.

Once the relatively low hurdle of Double Down's ILRS arguments is overcome, each of Plaintiff's other claims naturally flows and is sufficiently pled. First, because Plaintiff sufficiently states a claim for illegal gambling under the ILRS, she also sufficiently pleads a claim for violation of the ICFA, as courts regularly hold that the violation of another statute qualifies as a violation of the ICFA. Further still, Plaintiff also alleges that Defendant's conduct violated public policy, was immoral, and caused Plaintiff and the Class substantial economic injury.

Finally, Double Down contends that Plaintiff's unjust enrichment claim must be dismissed because it is based on her supposedly insufficient claim for violation of the ILRS and further, because she does not allege that she suffered any detriment. To the contrary, and as described above, Plaintiff's claim for the ILRS is sufficiently pled, and she alleges that Defendant unjustly retained (to her detriment) the more than $1,000 in losses she suffered.

For these reasons and as explained further below, Double Down's motion to dismiss should be denied in its entirety.

## **BACKGROUND**

## I. **THE DOUBLE DOWN CASINO.**

Defendant Double Down owns and operates the popular Double Down Casino, a game designed to appeal to a mass audience of "casual gamers." (*See* First Amended Class Action Complaint and Jury Demand, Dkt. 18 ["Compl."] ¶¶ 1, 18.) Casual gamers are enticed by the "free-to-play" model of games such as Double Down Casino, through which users are encouraged to download the game for free and prompted to buy many low-cost items within the game while playing. (*Id.* ¶¶ 9–11.) Over time, these games often influence addiction and psychological triggers similar to gambling addiction. (*Id.* ¶¶ 11–16.) None of these games,

however, are games of skill; rather, they are games of chance because their outcomes are entirely determined by Double Down's computerized algorithms. (*Id.* ¶ 30.)

Double Down Casino is available for play on Android and Apple iOS devices, Facebook, and on Defendant's website—offering a multitude of electronic versions of common casino games. (*Id.* ¶¶ 1.) New users are initially given a bundle of free Chips to play games, a cache that inevitably runs out. (*Id.* ¶¶ 2, 38.) After users have run out of this initial allotment, Double Down offers additional Chips for a cost—starting at $2.99 for 150,000 Chips (on mobile devices)—to allow them to play more games. (*Id.* ¶ 2, 36.) Though players purchase Chips from Double Down, it does not assign value to the Chips purchased until they are 'consumed,' or wagered and lost in Double Down Casino. (*Id.* ¶ 21.) When players win or buy large amounts of Chips, they can either use the Chips to make future wagers or "cash out" by selling their Chips to other Double Down Casino players on an external "black market." (*Id.* ¶ 34.)

## II.    PLAINTIFF USED AND LOST MONEY TO DOUBLE DOWN IN ITS DOUBLE DOWN CASINO.

Plaintiff Phillips is one such player of Double Down Casino who, like thousands of others, lost money to it in the unlawful gambling operation. (*Id.* ¶¶ 38–39, 54, 57–58.) In or around January 2013, Plaintiff began playing in Double Down Casino using her Facebook account. After running out of her initial allotment of free Chips, Phillips purchased Chips from Double Down to continue playing. (*Id.*) In total, Plaintiff purchased, wagered, and lost more than $1,000 worth of Chips playing in Double Down Casino. (*Id.* ¶ 39.) For example, on March 7, 2015, Plaintiff Phillips paid $59.00 to Defendant to convert her real-word dollars into 35,000,000 Chips, which she subsequently lost. (*Id.*)

## ARGUMENT

### I.    LEGAL STANDARD.

On a motion to dismiss, courts must view all facts in a complaint and draw all reasonable inferences in the light most favorable to the plaintiff. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). Detailed factual allegations are not required. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Instead, "[t]o survive a motion to dismiss, a complaint need only contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Id*. at 678 (citing *Twombly*, 550 U.S. at 570). As explained below, Phillips's Complaint easily meets and exceeds federal pleading requirements.

### II.   PHILLIPS PROPERLY PLEADS HER CLAIMS FOR RECOVERY UNDER THE ILLINOIS LOSS RECOVERY STATUTE.

First, Plaintiff properly pleads her claims under the Illinois Loss Recovery Statute. To plead a claim for recovery of losses under the ILRS, a plaintiff need only allege (i) that he or she lost (ii) a sum of money or thing of value worth at least $50 (iii) to the defendant (iv) and that he or she paid the defendant within six months of raising his or her claims. *See* 720 ILCS 5/28-8; *see also Holmes v. Brickey*, 335 Ill. App. 390, 395 (Ill. App. Ct. 3d Dist. 1948) (discussing predecessor to the ILRS). As explained further below, Phillips does just that. Nevertheless, Double Down argues that Phillips's ILRS claim must fail because (i) Double Down Casino is not "illegal gambling" as contemplated by the ILRS, (ii) it did not—and cannot—"win" as that term is defined by the ILRS, and (iii) similarly, Plaintiff and the putative Class did not—and cannot—"lose." Each of those arguments fails and is taken in turn below.

#### A.    Defendant's Casino Games are Illegal.

First, Defendant's contention that Double Down Casino is not a gambling device

misunderstands the express provisions of the Act. A "gambling device" is defined as any "slot machine, or other machines or device for the reception of money or other thing of value" through which "money or [any] other thing of value is staked, hazarded, bet, won or lost" through either "chance or skill[.]" 720 ILCS 5/28-2. Broken down, a gambling device is any device (such as a slot machine) that allows the wagering of money or some other thing of value upon chance, skill, or the action of the device. *See id*.

Here, Plaintiff sufficiently alleges that Double Down participates in illegal gambling. First, Plaintiff alleges that Chips are "things of value" because they can be purchased, can be wagered, and can be sold on the secondary market. (Compl. ¶¶ 1, 25, 28–31, 35, 51–57); *see also* 720 ILCS 5/28-2. Next, Plaintiff alleges that the Casino is a gambling device because it operates as a "slot machine" and, as such, is expressly enumerated as a gambling device under the Act. (Compl. ¶¶ 1, 25, 28–31, 35, 51–57); *see also* 720 ILCS 5/28-2. Finally, Plaintiff repeatedly alleges that Double Down Casino allows players to wager Chips, (*see* Compl. ¶¶ 2, 3, 28–30, 51–52), and that winning or losing each wager is based solely on chance—i.e., no matter what game is played, individuals have absolutely no say in or influence over the outcome. (*Id*. ¶ 30 ("Once a consumer spins the slot machine by pressing a button . . . none of Defendant's games allow (or call for) any additional user action."), 53); *People v. One Mach. Known as "Circus Days"*, 23 Ill. App. 2d 480, 488 (Ill. App. Ct. 2d Dist. 1960) (finding a machine a "gambling device" where its operation required only the deposit of money and the turning of a handle with no opportunity for the player to alter the outcome). Accordingly, Phillips has sufficiently pled that Double Down Casino is a gambling device pursuant to 720 ILCS 5/28-2.

Despite this clear application of the law to the facts, Defendant nevertheless contends that Plaintiff still fails to plead a claim for 720 ILCS 5/28-2 because (i) the Chips wagered are neither

money nor a thing of value and (ii) the game is neither a machine nor a device. (Def. Mot. at 12–15.) Each of these arguments fails on its face.

### i. *Chips are Things of Value.*

There is no question the Chips offered by Defendant, purchased by consumers, and wagered by both, are "things of value"—which are defined as "almost anything capable of being bought and sold." 720 ILCS 5/28-8. First, Defendant attaches a value to every Chip at two separate stages. It initially values the Chips in the form of the purchase price paid for them—starting at $2.99 for 150,000 Chips. (Compl. ¶¶ 2, 3, 23, 26, 52; *see also* Dkt. 27-1, Exhibit B (International Game Technology Form 10-k ("IGT 10-k")) at 7–8, 64.) It also provides a valuation on the Chips in the form of revenue accrued from Chip sales after they have been "consumed," or wagered and lost by players and won by the Casino. (Compl. ¶¶ 21, 35, 52; IGT 10-k at 7 (stating that revenue is realized by taking the total number of Chips sold and adjusting that amount based on when the Chips are consumed)); *see also* 720 ILCS 5/28-8 (allowing for the recovery of money or things of value amounting to more than $50—such as the Chips here).

Second, Chips have value because they grant users the ability to place additional wagers against Double Down in the Casino without spending additional money. (Compl. ¶¶ 3, 24–29, 52); (IGT 10-k at 7 (recognizing that the money players exchange for Chips is not realized until Chips are lost, therefore maintaining possession of Chips means players maintain the value of the Chips purchased; likewise, winning additional Chips grants the player additional value).)

In arguing to the contrary, Double Down relies upon the decision in *People v. One Mech. Device*, 11 Ill. 2d 151 (Ill. 1957) for the propositions that "free play" has no value, that Double Down offers no reward but free play, and that consequently, the purchase of Chips is nothing more than the opportunity to play. (Def. Mot. at 13.) That argument misses its mark. In fact, the

Illinois Supreme Court has expressly distinguished amusement games which reward players with nothing but amusement (like the pinball machines at issue in *One Mech. Device*) from slot machines which reward the player with things of value (like those at issue here) by stating:

> whereas a slot machine or a crap table entails no skill whatever, affords no amusement beyond that which the player enjoys when he is paid money, and within a few seconds parts the player from his money through his expectation of winning additional money, a pinball game is essentially an amusement game which can be, and frequently is, played for long periods of time with no reward to the player beyond the enjoyment of playing.

*One Mech. Device*, 11 Ill. 2d at 154–55. As with the slot machine (or craps table) described by the *One Mech. Device* court, Double Down Casino users are not limited to "no reward…beyond the enjoyment of playing." *Id.*; *see also One Mach. Known as "Circus Days"*, 23 Ill. App. 2d at 489 (finding a game of chance that only awarded free plays to be a gambling device). Instead, they win Chips that can be used either (i) to make varying future wagers in the hopes of winning additional Chips (not just have a limited number of free replays, as in pinball games) or (ii) to exchange their Chips for money on the secondary market—making it clear that the Chips have value.

With respect to the latter option—"cashing out" on the secondary market—Plaintiff specifically alleges that Double Down Casino players regularly post their accounts for sale on secondary markets. (Compl. ¶¶ 34, 52.) The presence of this flourishing secondary market demonstrates that the Chips *do* have value because third parties are willing to pay real money for them.[2] (Compl. ¶¶ 34, 52); *see also 1756 W. Lake St., LLC v. Am. Chartered Bank*, No. 14-cv-

---

[2] Defendant also argues that the secondary market cannot assign value to the Chips because Phillips failed to allege someone completed a transaction on the market. (Def. Mot. at 14.) This argument is flawed for two reasons. First, it rests on Defendant's own supposed belief rather than any actual authority. (*Id.*) Second, Double Down cannot argue that an interpretation that "anything capable of being bought and sold" as constituting a "thing of value" would yield an absurd result, while at the same time demanding that the Chips be bought and sold on the secondary market before it can be assigned value. (*Id.*)

1869, 2014 WL 5073354, at *4 (N.D. Ill. Oct. 9, 2014) (finding that fair market value is "the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect.") (quoting Black's Law Dictionary 1587 (8th ed. 2004)); *see also* 720 ILCS 5/28-8.[3] Indeed, the idea that something is bought and sold for real money (in this case, Chips), but still lacks any value whatsoever (as Defendant contends) just does not hold water.

Accordingly, Chips are a "thing of value" as required by 720 ILCS 5/28-2.

      *ii.    The Application is a Device.*

Next, the application is a device that fits squarely within the range of gambling devices regulated by the Act. The definition of a "gambling device" is broad and includes "any clock, tape machine, slot machine or other machine or device for the reception of money or other thing of value . . . ." 720 ILCS 5/28-2; *see also People v. One Slot Mach. Owned by Telequiz Corp.*, 344 Ill. App. 379, 393 (Ill. App. Ct. 2d Dist. 1951) (finding that a device is a "slot machine and a gambling device [when i]t is actuated by the insertion of money[ and i]t pays out money."); *Almy Mfg. Co. v. City of Chicago*, 202 Ill. App. 240, 245 (Ill. App. Ct. 1st Dist. 1916) (providing that a game of chance that allowed nickels to be wagered and coupons worth no less than five cents to be won on every play was a gambling device). A "device" is "a thing made for a particular purpose; an invention or contrivance." *See* Device, Dictionary.com, *available at* http://dictionary.reference.com/browse/ device.

Here, and as described above, there should be no question that Double Down's Casino is a "gambling device." First, the Casino is a "slot machine," which is expressly enumerated as an

---

[3]    Notably, Illinois courts have found that games provide "things of value" even when no real currency is involved, but when, for example, they are commonly "used by players to determine who shall buy the drinks or pay for refreshments, cigars or lunch…." *People v. One Pinball Mach.*, 316 Ill. App. 161, 173 (Ill. App. Ct. 2d Dist. 1942). The thing wagered, then, need not even be money or a representative of money so long as it carries *some* value.

example of an illegal "gambling device" in the statute itself. (Compl. ¶¶ 19, 28–32); 720 ILCS 5/28-2. It is also a gambling device because it operates upon the insertion of, and pays out, Chips (i.e., currency). *One Slot Mach.*, 344 Ill. App. at 393. Next, Double Down Casino is also a device because it was developed for a particular purpose—i.e., to serve as an online game of chance— and is a vehicle for effectuating online wagering between Defendant and users nationwide for Defendant's benefit. (Compl. ¶¶ 20, 22, 23 (discussing the design of Double Down Casino to lock consumers into gambling sessions), 27, 51 (discussing that Defendant designed its Casino to "encourage players to wager chips for a chance to win additional chips.")); *see also Almy Mfg. Co*, 202 Ill. App. at 244 ("The purpose of the machine, its quality and character, the possibilities of its operation and the manner in which it is susceptible of use are controlling factors in determining whether it is a gambling device[.]"). As such, it falls under the Act's purview based on a plain reading of its express language. *See* 720 ILCS 5/28-2 (contemplating a "gambling device" as a slot machine or other device upon which wagers may be made); *see also United States v. Hood*, 343 U.S. 148, 151 (1952) ("[W]e should not read out what as a matter of ordinary English speech is in.").

Defendant nevertheless argues that Double Down Casino is not a gambling device because (i) criminal statutes are to be strictly construed and (ii) "it is comprised of intangible software and played on the user's own device," when the doctrine of *ejusdem generis* requires a gambling device to be a tangible item. (Def. Mot. at 14-15.) Both of these arguments fail.

First, while "[i]t is true that criminal statutes are to be strictly construed[,]" that principle does not require that they be interpreted "so strictly as to limit their evident intent." *United States v. Jacobs*, 116 F. Supp. 928, 929 (N.D. Ill. 1953). Instead, "[t]he object in construing penal, as well as other statutes, is to ascertain the legislative intent . . . [t]hat constitutes the law." *United*

*States v. Hartwell*, 73 U.S. 385, 395–96 (1867). "The rule of strict construction is not violated by permitting the words of the statute to have their full meaning, or the more extended of two meanings . . . but the words should be taken in such a sense, bent neither one way nor the other, as will best manifest the legislative intent." *Id*. at 396. Here, the "strong legislative intent" behind the Act is to "prohibit gambling devices." *Playboy Hotel of Chicago, Inc. v. City of Chicago*, 147 Ill. App. 3d 984, 990 (Ill. App. Ct. 1st Dist. 1986); *see also One Pinball Mach.*, 316 Ill. App. at 174 (finding the "gambling propensity [is] . . . the very propensity the legislature sought to suppress."). Because the aptly-named Casino is a device that allows consumers to gamble, it should easily be considered a gambling device.

Next, the doctrine of *ejusdem generis* does not even apply to the statute. *Ejusdem generis* is a rule of construction used "where words are of obscure or doubtful meaning." *Yates v. U.S.*, 135 S. Ct. 1074, 1098 (2015). "[W]hen words have a clear definition, and all other contextual clues support that meaning," *ejusdem generis* cannot be used in an "attempt to create an ambiguity where the statute's text and structure suggest none." *Id*. (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008)). But if the rule is applied, it simply counsels that "[w]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id*. at 1087.

Here, the statute presents no such "obscure or doubtful meaning," *id*. at 1098, as Defendant's Double Down Casino is both a slot machine (as enumerated in the statute) and a device (as the term is commonly understood). *See* Section II(A)(*ii*), *supra*; *see also Sebelius v. Cloer*, 133 S. Ct. 1886, 1896 (2013) ("[W]hen [a] statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it

according to its terms."). The fact that it is a virtual slot machine as opposed to a physical, tangible object that receives coins through a slot makes no difference. *Id.*[4] Indeed, Defendant can point to no authority that requires the "slot machine" enumerated within the Act must be a physical device only and contain no computer software or virtualization. Moreover, the idea that casinos are permitted to avoid the purview of Illinois' gambling laws simply by offering their games via network based software rather than a traditional slot machine is clearly not what the Illinois legislature intended.

In the end, "[t]he law is not required to be blind to, and ineffectual against, the ceaseless efforts and ingenuity of persons to circumvent the gambling device Act." *One Mach. Known as "Circus Days"*, 23 Ill. App. 2d at 491; *see also Zeller v. White*, 106 Ill. App. 183, 188 (Ill. App. Ct. 2d Dist. 1902) ("Gamblers ought not to be permitted to evade the statute by selecting intricate games."). Instead, because Double Down Casino has all of the relevant features of a "[device] of chance and [its] purpose [is] to stimulate the gambling propensity, [it is clearly of] the very propensity the legislature sought to suppress." *One Pinball Mach.*, 316 Ill. App. at 174.

Accordingly, the Court should find that Double Down Casino is a gambling device within the purview of the Act.

### B.  Defendant is a "Winner" Under the Statute.

Defendant is also a "winner" under the ILRS. Courts have regularly found that a winner is a party who "participated in the risk of the . . . wager" and wins (i.e., receives a gain) upon the happening of a certain future event. *Langone v. Kaiser*, No. 12-cv-2073, 2013 WL 5567587, at *6 (N.D. Ill. Oct. 9, 2013). Relevant here, the operators of digital casino games are "winners" upon "gain[ing] the money people lost playing the games." *Id.* at *7 (citing *Moushon v. AAA*

---

[4]     Defendant also offers no authority or reason to support its contention that the Act is only limited to tangible manifestations of the items enumerated therein. (Def. Mot. at 14–15.) A more plausible categorization may be that the enumerated items limit the Act's application to devices used in gambling.

*Amusement, Inc.,* 267 Ill. App. 3d 187 (Ill. App. Ct. 4th Dist. 1994)).

Double Down easily fits this bill. In particular, Double Down participates in each wager made by a player because (1) it either loses (pays the player Chips) or wins (gains the Chips wagered by the player), (2) upon the happening of a future event (i.e., the player losing or winning a slot machine spin, roulette spin, etc.). *Id.* Thus, at its simplest level, Double Down wins in the same manner as operators of real-world casinos and other video gambling games by "gain[ing] the money people lost playing the games." *Id.* Despite the fact that Double Down easily qualifies as a "winner," Defendant argues that it cannot win because it does not have a direct stake in the gambling and does not risk its own money. Those arguments lack merit.

       *i.*      *Defendant Has a Direct Stake in the Illegal Gambling.*

First, courts regularly find that defendants are "winners" under the ILRS when they have a direct stake in the illegal gambling. *See Sonnenberg v. Oldford Group, Ltd.*, No. 13-cv-0344, 2015 WL 1379505, at *6 (S.D. Ill. March 24, 2015). Here, Double Down has a direct stake in the outcome of the gambling because every time a user plays a game, Double Down runs the risk of either winning (and gaining that user's wager) or losing (and paying the user accordingly). (Compl. ¶¶ 28–33, 36, 53–57.) As such, Double Down competes directly with players for every wager made, the end result being that one party wins on every wager placed and the other party loses. *See Pearce v. Foote*, 113 Ill. 228, 239 (1885) (holding that defendants were winners and participated in the risk of the wager because either they, or their client, could be "winners" or "losers" depending on the "happening of a certain [future] event.").

This direct participation in the wagers is reflected in the very way Double Down realizes its revenue. As alleged, Defendant refuses to assign revenue generated from the sale of the Chips until a user actually *wagers* and *loses* them in the Casino games. (Compl. ¶¶ 34–37; IGT 10-k at

7 (identifying IGT's social gaming revenues as the number of Chips sold adjusted for the estimated period of time it takes for the Chips to be consumed).) As such, Double Down itself recognizes that with each loss it suffers and each resultant payout it makes to a user, it loses the revenue it would otherwise have generated through the sale of additional Chips. (Compl. ¶¶ 34–37; IGT 10-k at 64 (recognizing that revenues from the purchase of Chips are recognized "over the estimated average service period in which the [C]hips are consumed based on historical data analysis.").)

Defendant's reliance on the *Reuter v. Mastercard Int., Inc.*, 397 Ill. App. 3d 915, 924 (5th Dist. App. 2010) matter for the proposition that "any putative 'incidental' benefit or detriment [it] allegedly realized" was simply a result of its "parent company's alleged accounting practices[,]" and is "too speculative and attenuated to implicate the ILRS[,]" is also misplaced. (Def. Mot. at 9.) For one, unlike Double Down here, the defendant in *Reuter* was not directly involved in the gambling at issue, but rather, a credit card company that financed players' purchases of casino chips for a small fee and charged additional periodic interest on any balances that remained on a player's credit account following their purchase. *Id.* at 923. Thus, it was a *third party* to the gambling at issue—it did not (like Double Down) participate in any wagers with the players, did not win or lose based on the wagers, and its involvement was completed *prior to* the actual act of gambling. *Id.* at 924. Here, on the other hand, Double Down has a direct stake in the gambling, because it participates in and profits from it.

ii.     *Defendant Risks its Own Money Through Double Down Casino.*

Further, as a result of its direct stake in the gambling, Double Down also risks its own money. A party risks its own money when the potential gain or loss is uncertain, and "if there was a loss, [the party] was to pay [the loss] to [its opponent], [or] if there was a gain, [its

opponents] were to pay it to [the party]." *Langone,* 2013 WL 5567587, at *6.

As discussed, Defendant only realizes revenue when the Chips sold are consumed—i.e., wagered—by players and won by Defendant. (Compl. ¶¶ 34, 56–57; IGT 10-k at 7 (explaining how revenues are not calculated until the Chips have been consumed).) Thus, the more that consumers win (and Defendant loses) within the Casino the smaller Defendant's revenue will be. And by contrast, the more that Defendant wins (and consumers lose), the greater its revenue will be. Thus, its revenue is entirely dependent on the award of Chips, and it therefore risks its own money on every wager it enters into with consumers.

Defendant cites a number of cases in an attempt to support its argument that it never undertook a risk of loss in its wagers with Double Down Casino users.[5] (Def. Mot. at 6–8.) Each of those cases is distinguishable, as they deal with lawsuits against websites that merely charged an initial fee to play and offered users the ability to gamble *against each other*, not with the website itself. *See Langone,* 2013 WL 5567587, at *1 (charging an entry fee); *Fahrner v. Tiltware LLC,* No. 13-cv-0227, 2015 WL 1379347, at *7 (S.D. Ill. Mar. 24, 2015) (charging a per hand commission); *Sonnenberg,* 2015 WL 1379505 at *5 (same). In each of those cases, the courts determined that the respective defendants did not risk money because they did not participate in the wager, instead profiting from the administration of the website and offering of services. *See Langone,* 2013 WL 5567587, at *6 (discussing the fact that the defendant did not

---

[5]    Defendant also argues that its revenue is based exclusively on the sale of virtual Chips, and that the outcome of the gambling games has no effect on it. That argument attempts to create a distinction where none exists. While it is true that Defendant's revenue is based, in part, on the number of Chips sold, that number is dictated by the outcome of the game—the more Chips lost, the more Chips consumers will purchase; and the more Chips won, the less they will purchase. (IGT 10-k at 7.) Defendant's cited authorities do not require a different result, as they each address a situation in which an entry fee of sorts was paid to utilize a service, and "[a]bsolutely nothing [was] undetermined or contingent . . . and thus, the participants d[id] not 'risk' losing their entry [] fees." *Manning v. Creative Headquarters, LLC,* No. 11-cv-02203 (N.D. Ill. Mar. 30, 2012); *see also Reuter,* 397 Ill. App. 3d at 925 (expressly stating that the defendant did not "participate[] in gambling."); *In re MasterCard Int'l Inc.,* 313 F.3d 257, 262 (5th Cir. 2002) (the conduct alleged occurred before any gambling).

risk its own money by simply providing a service through which it did not wager); *Fahrner*, 2015 WL 1379347, at *7 (charging per hand fee for administering poker game was not gambling under the Act when players wagered only against each other); *Sonnenberg*, 2015 WL 1379505, at *5 (defendants not involved in wager where they did not stand to lose or win on the wager itself). By contrast, Defendant participates in every wager placed in the Casino and either wins or loses each time. (Compl. ¶¶ 34, 56–57.) As such, it risks its revenue and thus, its own money.

### C. Phillips and the Putative Class Lost Money to Defendant Through its Casino.

As a follow-up to its argument that it did not stand to "win" anything from consumers, Defendant also argues that it cannot be liable because Plaintiff and the Class did not stand to lose anything. That argument is equally hollow.

As discussed above, Plaintiff and other Class members were as capable of being either "winners" or "losers" pursuant to the ILRS as Defendant. *See* Section II(B) *supra*. When wagering in the Casino, the ultimate consequence of Plaintiff and the Class placing a bet "hung in the balance"—it was not until the spin was complete that they learned whether they won or lost money to Defendant. (Compl. ¶ 30.) Unfortunately for Plaintiff, over the course of two years, she purchased, wagered, and lost more than $1,000. (*Id.* ¶ 39.)

Defendant nevertheless argues that these are not losses under the ILRS, because (i) Plaintiff lost virtual Chips—not money—and (ii) got exactly what she paid for—virtual Chips. (Def. Mot. at 11–12.) Those arguments likewise fail. First, by arguing that Plaintiff lost Chips instead of money, Defendant seeks to create a distinction where none exists. Upon purchasing Chips, Plaintiff merely converted her real-world currency into virtual Chip-currency, which is no different than in a physical casino where individuals insert money into machines and are presented with "credits" to play. Thus, the money that Phillips spent in purchasing the Chips at

issue (more than $1,000) stands as a valuation of the money wagered, and lost, in the form of Chips.[6]

That aside, Defendant cannot seriously argue that Plaintiff's claim is precluded because she paid for Chips and ultimately received them. First, as in all real-world casinos, individuals regularly transfer real-world currency to virtual credits in order to play a game. That, however, cannot shield a defendant from liability under the ILRS, because the illegal conduct is the wager that comes later, rather than the transfer of currency itself. Moreover, and unlike in real-world casinos, Plaintiff did not get exactly what she paid for inasmuch as she purchased Chips with the expectation that they would be used in a legal game of simulation (as advertised by Defendant), not the illegal one she later discovered she was playing.

Defendant's sole authority in support of its argument does not reach a different conclusion. Indeed, in *Humphrey v. Viacom, Inc., et al.*, No. 06-cv-2768, 2007 WL 1797648, at *10 (D.N.J. June 20, 2007), the court found that the entry fee paid by a player to participate in a fantasy league did not constitute illegal gambling because the fee never hung in the balance as a prize between the parties and therefore could never be lost by the player. Different here, Phillips wagered her Chips directly against Defendant and stood to win or lose with each press of the "Spin" button. Thus, each wager "hung in the balance" and she stood to—and did—lose as a result. (Compl. ¶ 25 (demonstrating that players *must* purchase additional Chips to continue their gaming sessions once they lose their current balance).)

---

[6]     Defendant attempts to further buttress its argument by contending that the ILRS only allows the recovery of the "virtual chips she lost" in its scheme. (Def. Mot. at 11.) However, it fails to cite any authority for this limitation upon the statute. Indeed, the statute itself allows for third parties to recover "triple the amount" determined by the trier of fact to be lost. *See* 720 ILCS 5/28-8. This language demonstrates that the statute acknowledges the recovery of money relative to the actual dollar value lost. *Id.* Additionally, to prevent such recovery would foil the purpose of the statute. *Jacobs*, 116 F. Supp. at 929 ("It is true that criminal statutes are to be strictly construed but not so strictly as to limit their evident intent.") (citing *Hartwell*, 73 U.S. 385).

i. *Plaintiff Adequately Pleads Loss*

In addition to pleading that she stood to lose under the ILRS, Plaintiff also sufficiently alleges that she suffered a loss. To plead loss under 720 ILCS 5/28-8(a), a plaintiff must simply plead "who was the winner, who was the loser, when the loss took place, and the amount of money lost." *Sonnenberg,* 2015 WL 1379505, at *6 (citing *Langone,* 2013 WL 5567587, at *4). Here, Plaintiff did just that by explaining that (i) she (the loser), (ii) purchased, wagered, and lost at least $1,000 (the amount lost) between January 2013 and April 2015 (when the loss took place) to Defendant (the winner).[7] (Compl. ¶ 39.) Nothing more is required.

Turning to *Fahrner* and *Sonnenberg* again, Defendant contends that Plaintiff was required (but failed) to allege "the exact date and amount of loss." (Def. Mot. at 16.) That reliance is misplaced. In both of those matters the courts dismissed the plaintiffs' claims because they merely alleged "multiple" $50 losses at unspecified times over a period of several years to unknown winners, when they should have alleged that a sum of $50 or more was lost to a particular individual within the previous six months. *Fahrner*, 2015 WL 1379347, at *6; *Sonnenberg*, 2015 WL 1379505, at *6; *see also* 720 ILCS 5/28-8(a). Here, of course, Phillips has specifically alleged that she purchased $59 worth of Chips on March 7, 2015 (Compl. ¶ 39), which she subsequently lost to Defendant prior to filing her initial Complaint on April 10, 2015. (*Id*.) Accordingly, Plaintiff adequately pleads her loss.

---

[7]     In fact, Plaintiff pleads with more specificity than required, alleging that she purchased $59 of Chips on March 7, 2015, which she subsequently lost before April 10, 2015. (Compl. ¶ 39.)

ii.     *Counts I and II of the FAC are Not Duplicative.*

Finally, Defendant also argues that either Count I or Count II of the Complaint should be dismissed as duplicative. (*See* Def. Mot. at 16–17.) That argument fails to understand the nature of the claims and the fact that they are pled in the alternative.

While Plaintiff recognizes that the allegations in Counts I and II of her FAC are similar, they are raised on different legal theories. Count I is premised on Plaintiff's theory that the Casino offers consumers a "continuous gambling session," (i.e., the session continues over the span of months and even years if individuals continue to use their accounts without cashing out) and, thus, that wagers made *outside of the six months* preceding the filing of the action are recoverable when the gambling sessions ended within that continuous session. *See Zeller,* 208 Ill. at 527 (recognizing that a 'sitting' of poker, "no matter how many hands are played, may be regarded as one transaction[,]" and that all the money wagered at any time during the sitting "is to be regarded as in play so long as the sitting continues[.]"). Plaintiff brings Count II (in the alternative to Count I) pursuant to the theory (advanced by Defendant) that a plaintiff's ability to recover is limited to a loss of $50 or more in the six months immediately preceding the filing of the action—and that any wagers placed and money lost prior to that time are unrecoverable. (Compl. ¶¶ 48–70.) Of course, claims raised in the alternative—like those here—are specifically contemplated by Fed. R. Civ. P. 8 and regularly allowed by courts in this District. *See* Fed. R. Civ. P. 8(d)(2); *see, e.g., Carlson v. Nielsen*, No. 13-cv-5207, 2014 WL 4771669, at *3 (N.D. Ill. Sept. 24, 2014) (recognizing that a party "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones[.]").

## III.     PLAINTIFF PROPERLY PLEADS A CLAIM FOR VIOLATION OF THE ICFA.

Defendant next argues that Plaintiff's claim for violation of the ICFA fails because (i)

"[t]he [g]ames do not offend Illinois public policy against gambling," (ii) the games are not "immoral unethical or scrupulous," and (iii) "Plaintiff has suffered no injury whatsoever." (Def. Mot. at 17-19.) Those arguments are unavailing as well.

"The [ICFA] is 'liberally construed to effectuate its purpose' of protecting 'consumers against unfair . . . acts or practices.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). To state a claim under the ICFA, a plaintiff must allege "[an unfair] act or practice by the defendant." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). An unfair practice is one that "(1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). Further, the ICFA allows a plaintiff to "predicate an ICFA unfairness claim on violations of other statutes or regulations…." *Parker v. EMC Mortgage Corp.*, No. 11-cv-05682, 2014 WL 7205474, at *4 (N.D. Ill. Dec. 18, 2014).[8] "[A]ll three of the criteria . . . do not need to be satisfied to support a finding of unfairness . . . the Illinois high court has held that [a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *See Batson*, 746 F.3d at 830 (internal citations omitted).

As an initial matter, Plaintiff has successfully stated her ICFA claim through her allegations that Defendant illegally operated a gambling device (Compl. ¶¶ 62–63, 78–79), and consequently violated an Illinois' gambling statute (720 ILCS 5/28-1(3). *See, e.g.*, *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 827 (N.D. Ill. 2013) ("Because [the] alleged acts

---

[8] There are two additional elements to state a claim under the ICFA: "[i] the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and [ii] the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Wigod*, 673 F.3d at 574. Defendant does not take issue with the sufficiency of Plaintiff's allegations in this regard, but for the sake of clarity, Plaintiff alleges that she relied upon Defendant's unfair practice by playing Double Down Casino and that the practice occurred during the marketing and sale of Chips and operation of Double Down Casino. (*See* Compl. ¶¶ 4, 35, 38–39, 74–82.)

violated Illinois statutory and common law, the amended complaint states a viable ICFA unfairness claim.").

In addition, Plaintiff alleges that Defendant's conduct offends public policy, is immoral, and causes substantial injury to consumers. First, Plaintiff alleges that Defendant's conduct violates public policy because it promotes (and is) illegal gambling, a practice that has been outlawed in Illinois. *See Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011) ("[A] practice can offend public policy 'if it violates a standard of conduct contained in an existing statute or common law doctrine that typically applies to such a situation.'").

Next, Plaintiff alleges that Defendant's conduct is immoral because it is designed to encourage illegal gambling while marketing the Casino as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations. *See Modernistic Candies v. Fed. Trade Comm'n*, 145 F.2d 454, 455 (7th Cir. 1944) ("gambling is immoral and to be condemned"); (*see also* Compl. ¶¶ 11–17.)

Finally, Phillips also alleges that she suffered a substantial economic injury in the amount of more than $1,000 as a result of Defendant's conduct. (Compl. ¶¶ 39, 79); *see also Romo v. Fed. Nat'l Mortgage Ass'n*, No. 14-cv-1891, 2014 WL 5620157, at *4 (N.D. Ill. Nov. 4, 2014) ("In order to satisfy the substantial injury factor, a plaintiff must allege an actual economic injury."). And when these injuries are combined with the losses suffered by the "public as a whole," they are undeniably substantial. *See Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 780 (N.D. Ill. 2008) (finding the sending of unsolicited faxes to multiple people, in the aggregate, to be a substantial harm); (Compl. ¶¶ 4, 23–26, 39, 82.)

Defendant nonetheless argues that the injury suffered by Phillips could have been avoided by simply "seeking other forms of entertainment." (Def. Mot. at 19.) However that does not fully capture the factual situation. Phillips, and other consumers, were never presented with any disclaimer of the software's illegality in the state of Illinois prior to downloading, or during the use of, Double Down Casino. As such, Phillips could not reasonably have avoided becoming a victim of Defendant's violations of the Act and the resulting unfair conduct.

Accordingly, Plaintiff's ICFA claim should stand.

## IV.    PLAINTIFF'S CLAIM FOR UNJUST ENRICHMENT LIKEWISE SURVIVES.

Finally, Defendant argues that Plaintiff's unjust enrichment claim must fail because (i) it is based upon the same allegations in her claim for recovery under the ILRS, which are insufficiently pled and (ii) Plaintiff did not allege she suffered any detriment. Those arguments miss their mark. First, and as explained above, Phillips's claims for recovery under the ILRS are sufficiently pled and second, Plaintiff pleads each element of her unjust enrichment claim.

To state a claim for unjust enrichment, Plaintiff must allege that Defendant "(1) received a benefit, (2) to [her] detriment, and (3) [its] retention of the benefit would be unjust." *See TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998); *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). Here, Phillips alleges that Double Down received a benefit from her in the form of the more than $1,000 she paid to purchase and wager virtual Chips in the Casino and that Double Down has retained that benefit. (Compl. ¶¶ 39, 84–86.) She alleges further the retention of those monies is unjust, because Double Down procured them through unlawful means—namely the operation of its illegal gambling device, Double Down Casino. (*Id.* ¶¶ 38–39, 85–86.)[9] Defendant argues that the illegal basis for its ill-gotten gains

---

[9]    Additionally, the agreement between the Parties related to the sale of Chips is void as a matter of law pursuant to 720 ILCS 5/28-7(a) because a portion of the consideration exchanged was Plaintiff's

should not make its retention of Plaintiff and the Class's money unjust because it was paid "in exchange for permitting her to play the Games." (Def. Mot. at 21.) This, however, ignores Phillips repeated allegations that *any* benefit she conferred upon Defendant was a result of her unintentional wagering in Defendant's unlawful games of chance. (Compl. ¶¶ 83–86.) As such, its retention of these illegal profits is illegal and done to the detriment of Phillips and the Class.

Accordingly, Phillips has adequately pled her claim for unjust enrichment as well.

## CONCLUSION

For the foregoing reasons, Plaintiff Margo Phillips, individually and on behalf of all others similarly situated, respectfully requests that the Court enter an Order (i) denying Defendant's motion to dismiss in its entirety, (ii) requiring Defendant to answer Plaintiff's First Amended Class Action Complaint and Jury Demand, and (iii) providing such other and further relief as the Court deems reasonable and just.

Respectfully Submitted,

**MARGO PHILLIPS**, individually and on behalf of all others similarly situated,

Dated: September 14, 2015        By: /s/ Benjamin H. Richman
                                     One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Amir C. Missaghi
amissaghi@edelson.com
Courtney C. Booth
cbooth@edelson.com

---

money, which Defendant obtained as a result of violating 720 ILCS 5/28-1(a)(3) by operating, owning, and distributing Double Down Casino, a gambling device.

EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## <u>CERTIFICATE OF SERVICE</u>

    I, Benjamin H. Richman, an attorney, hereby certify that on September 14, 2015, I served the above and foregoing ***Plaintiff's Opposition to Defendant's Motion to Dismiss*** by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Benjamin H. Richman         