**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARGO PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 04301 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| DOUBLE DOWN INTERACTIVE LLC | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Margo Phillips brings this proposed class-action suit against Double Down Interactive LLC, alleging that Double Down's online casino games are not just games—they are unlawful gambling devices under Illinois state law.[1] R. 18, Am. Compl.[2] Phillips seeks to force Double Down to stop operating those alleged devices, and she also wants to recover all lost monies paid to the online casino. *Id.* Double

---

[1]Double Down removed the case from state court to federal court. R. 1, Notice of Removal. This Court has jurisdiction under 28 U.S.C. § 1332(d) (Class Action Fairness Act), because the case meets the class-size, citizenship, and amount-in-controversy requirements. The proposed class has more than 100 members: Double Down represents that from January 1, 2013 to March 31, 2015 (the time period that Phillips accessed the site), nearly 18,000 people either accessed Double Down from Illinois or bought at least $50 worth of chips from an Illinois IP address. *Id.* ¶ 19. The parties are also minimally diverse: Phillips (and all other proposed class members) are Illinois citizens, whereas Double Down's sole member is International Game Technology, a Nevada corporation with its principal place of business in (where else) Las Vegas, Nevada. *Id.* ¶¶ 21-25. Finally, the amount in controversy is more than five million dollars. In both 2013 and 2014, the proposed class together spent more than seven million dollars on chips. *Id.* ¶¶ 31-35.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

Down has moved to dismiss all counts in Phillips's First Amended Complaint.[3] R. 24. For the following reasons, Double Down's motion is granted.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the First Amended Complaint and draws all reasonable inferences in the plaintiff's favor. *McGowan v. Hulick*, 612 F.3d 636, 637 (7th Cir.2010). Double Down Interactive LLC is owned by International Game Technology (IGT), a large publicly-owned designer and manufacturer of traditional gambling games. R. 18, Am. Compl. ¶ 20. Double Down operates a virtual casino called "Double Down Casino." *Id.* ¶¶ 1, 18. Players can access Double Down Casino through its website or through its free application, which can be downloaded on mobile devices like iPhones and Android phones. *Id.* ¶¶ 1, 18, 33. Players can also access Double Down Casino through Facebook. *Id.* ¶ 18. In its marketing descriptions, Double Down describes the online casino as "the FULL casino experience." *Id.* ¶ 19 (emphasis in original). Some of the electronic games offered in Double Down Casino include "authentic" slot machines, roulette, poker and black jack. *Id.* ¶¶ 1, 19. All of Double Down's casino games are games of chance, as each game's outcome is determined solely by Double Down's computerized algorithms. *Id.* ¶ 30.

---

[3]Although Federal Rule of Civil Procedure 23(c)(1) requires that certification be decided as soon as practicable, a defendant may ask for a merits decision early on, even before a Rule 23 decision, if the defendant is willing to forgo preclusive effect and prefers defending against the members of the class one-by-one. *Wiesmueller v. Kosobucki*, 513 F.3d 784, 787 (7th Cir. 2008) (citing *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941-42 (7th Cir. 1995)). At some point, if there are so many one-by-one cases that the judicial system (and thus the public) is better off with a class-wide decision, then a court may decide the Rule 23 question before the merits decision, regardless of what the defense wants. There is no reason to think that point has been reached for the claim at issue in this case.

To play the Casino's games, players must have virtual "chips." *Id.* ¶ 2. Players use these chips to wager on the games. *Id.* First-time visitors to the site are offered a bundle of free chips (one million chips, to be exact) with which to play. *Id.* ¶¶ 2, 24. Returning players are offered additional virtual chips free of charge each day. R. 1, Exh. E ¶ 4 (John Clelland Decl.); R. 51, Pl.'s Resp. to Def.'s Second Citation to Add'l Authority, at 2 n.2 (noting that players are awarded free chips on Double Down's website and citing, without contesting, Double Down's assertion that returning players are given additional free chips each day); *see also* Double Down Casino, http://www.doubledowncasino.com (last visited March 25, 2016) (website states: "Return to the game daily and receive more free chips every day."). To begin playing, players select the amount of chips they would like to wager on a particular game. Am. Compl. ¶ 28. For example, if playing a slot machine, a player would select how many chips he or she wishes to bet on a particular spin. *Id.* If the player wins that game or spin, then that player is awarded more virtual chips with which to play. *Id.* ¶¶ 31, 32. If that player loses, however, then he or she may lose some or all of the betted chips, depending on the game. *Id.* ¶ 35. Regardless of the game played, the only thing a player can win from the casino is more virtual chips. *Id.* ¶¶ 3, 30-33. If players run out of free chips, then Double Down Casino gives players the option to buy more chips. *Id.* ¶ 26. For example, a player can buy 150,000 chips for $3.00, one million chips for $8.00, or as many as 100 million chips for $99.00. *Id.* (Prices vary slightly depending on whether the player is accessing Double Down Casino through a computer or mobile device. *Id.*) The player can also wait a day for

the next free allotment of chips if the player does not want to buy chips (Phillips does not challenge this factual assertion made by Double Down). R. 1, Exh. E ¶ 4 (John Clelland Decl.); R. 51, Pl.'s Resp. to Def.'s Second Citation to Add'l Authority, at 2 n.2.

Double Down Casino chips can only be used to play its online games. Double Down does not offer any cash for the virtual chips, meaning players are not able to "cash out" their chips with Double Down for "'real world' money, goods, or other items of monetary value." R. 27-1, Exh. A, Rebekah H. Parker Decl. at 6 (Double Down's "Terms of Use," available at http://www.doubledowncasino.com); R. 36-1, Pl.'s Resp. Br. at 10 (noting that "[w]hen players win or buy … Chips, they can either use the chips to make future wagers or 'cash out' by selling their Chips to other Double Down Casino players on an external 'black market.'"); Am. Compl. ¶ 34 (alleging that players can cash out their accounts on the secondary market only); *see also* R. 51, Pl.'s Resp. to Def.'s Second Citation to Add'l Authority, at 3.. According to the site's Terms of Use, Double Down specifically "prohibit[s]" the "transfer of Virtual Currency [that is, virtual chips]" and requires players to agree that they will not, "[t]ransfer, sell, or re-sell" chips to any other party. R. 27-1, Exh. A, Rebekah H. Parker Decl. at 6. But even so, according to Phillips (and accepted as true for deciding the dismissal motion), players are still able to "cash out" their chips by listing their accounts on the secondary market. Am. Compl. ¶ 34.

As part of its recordkeeping, Double Down keeps track of each wager, outcome, and win made by each player. *Id.* ¶ 36. It also regularly analyzes how

"chips are consumed"; that is, how long it takes for players to run out of chips. *Id.* ¶ 37. It is through the sale of chips that Double Down (and in turn, its parent company IGT) earns revenue. *Id.* ¶ 21; R. 27-1, Exh. B, IGT Form 10-K at 7. In 2014, for example, Double Down (as reported in IGT's annual SEC filings) reported over $240 million in revenue.[4] Am. Compl. ¶ 23; IGT Form 10-K at 36. For accounting reasons, IGT keeps track of not only Double Down's revenue, but also its "bookings," or "the total amount of virtual casino chips sold during [a] period." IGT Form 10-K at 7. IGT tracks this information because it defers the recognition of Double Down's revenue "based on the estimated period of chip consumption." *Id.* at 7, 64. In other words, for accounting-reporting purposes, Double Down does not realize all of its chip sales in the fiscal period in which those chips are sold; rather, it defers the recognition of its chip sales until the chips are estimated to have been consumed (that is, wagered on games), which could, but does not have to be, in the same fiscal period the chips are bought. *Id.* at 64.

Around January 2013, Phillips began playing games at Double Down Casino through her Facebook account. Am. Compl. ¶ 38. After she used all of her initial free chips (that is, the one million chips given to first-time users), she began buying chips. *Id.* From January 2013 to April 2015, Phillips played a variety of Double Down's slots and roulette games, each time wagering her chips in an attempt to win

---

[4]In her complaint, Phillips repeatedly relies on IGT's 10-K and states that Double Down "saw revenues of over $240 million from the sales of online chips" in 2014. Am. Compl. ¶ 23 (emphasis omitted). A review of IGT's 10-K for that same year, however, suggests that Double Down actually had revenue of over $280 million from social gaming, which appears to consist only of chip sales from Double Down. R. 27-1, IGT Form 10-K at 6-7, 36, 40.

additional chips. *Id.* ¶ 39. Phillips alleges that during that same time period—from January 2013 to April 2015—she wagered and lost over $1,000 worth of chips. *Id.* She further alleges that she lost at least fifty dollars' worth of chips in the last six months. *Id.* (alleging that on March 7, 2015, she paid $59.00 to Double Down for 35 million chips, all of which she later lost). As will be discussed later, the fifty-dollar allegation is a necessary threshold for the primary Illinois statute at issue.

In April 2015, Phillips filed a class-action complaint against Double Down in the Circuit Court of Cook County, Illinois, alleging that Double Down operates unlawful gambling devices, and that "[b]y operating its virtual casino, [Double Down] has illegally profited from thousands of Illinois consumers." R. 1, Exh. A, State Court Compl. ¶ 4. Phillips brought suit on her own behalf, as well as on behalf of "[a]ll individuals domiciled in the State of Illinois who lost $50 or more to [Double Down] through Double Down Casino." *Id.* ¶ 35. Double Down removed the case to federal court. *See supra* n.1.

After the case was removed, Double Down filed a motion to dismiss all counts in Phillips's original complaint. R. 12. In response, Phillips filed an Amended Complaint. R. 18, Am. Compl. In her Amended Complaint (which this Opinion will simply call her "Complaint" going forward, for convenience's sake), Phillips asserts four causes of action. In Counts 1 and 2, Phillips argues that Double Down's casino violates the Illinois Loss Recovery Act, 720 ILCS 5/28-8(a). *Id.* ¶¶ 48-59, 60-70. In Count 3, Phillips argues that Double Down's casino violates the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1 *et seq. Id.* ¶¶ 71-82.

6

Finally, in Count 4, Phillips argues that Double Down has been unjustly enriched through its gambling devices. *Id.* ¶¶ 83-87. Double Down then filed its current motion to dismiss all counts in Phillips's Complaint. R. 24.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *McGowan v. Hulick*, 612 F.3d 636, 637 (7th Cir. 2010) (courts accept factual allegations as true and draw all reasonable inferences in plaintiff's favor). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679; *see also McCauley v. City of Chicago*, 67 F.3d 611, 616 (7th Cir. 2011).

### III. Analysis

### A. Counts 1 and 2: Illinois Loss Recovery Act

The first two counts of the Complaint rely on Section 28-8 of the Illinois Loss Recovery Act. 720 ILCS 5/28-8. That section creates a cause of action to recover gambling losses: "Any person who by gambling … lose[s] to any other person, any sum of money or thing of value, amounting to … $50 or more … may sue for and recover the money or other thing of value[] so lost." 720 ILCS 5/28-8(a); *Reuter v. MasterCard Int'l, Inc.*, 921 N.E.2d 1205, 1208 (Ill. App. Ct. 2010). "Gambling," in turn, is defined as "knowingly play[ing] a game of chance or skill for money or other thing of value." 720 ILCS 5/28-1(a)(1). Both the statutory language and the case law interpreting the statute make clear that a plaintiff may only recover what he or she "lost" from the person who "won" it, and that what was lost (and correspondingly won) must be money or some other thing of value. *See People v. One Mech. Device*, 142 N.E.2d 98, 100 (Ill. 1957); *Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509, 510-11 (7th Cir. 2016); *Soto v. Sky Union, LLC*, 2016 WL 362379, at *8 (N.D. Ill. Jan. 29, 2016).

Double Down advances several arguments in targeting Phillips's Illinois Loss Recovery claims. Double Down argues that: (1) its online casino games are not "gambling devices" under the statute, (2) it is not a "winner" under the statute, and Phillips is not a "loser," (3) the Complaint does not adequately plead that Phillips suffered a loss, and (4) Counts 1 and 2 are duplicative. R. 27, Def.'s Br. at 6-15.

### i. Online Casino Games as "Gambling Devices"

Double Down first argues that its online games are not "gambling device[s]." The Illinois Loss Recovery Act defines a "gambling device" as "any clock, tape machine, slot machine, or other machines or device for the reception of money or other thing of value" that on "chance or skill … is staked, hazarded, bet, won or lost." 720 ILCS 5/28-2(a). Double Down asserts that its online games are not covered by the Act because (a) only tangible devices, not internet games, can be gambling devices; and (b) its virtual chips are not "things of value." Def.'s Br. at 12-15.

In Double Down's view, the definition of gambling device "clearly refers to a physical, tangible object—a device that can 'receive' money like a slot machine," and not "internet games which consist of intangible software." *Id.* at 14-15. Double Down invokes a statutory-interpretation principle known as *ejusdem generis*, which is a Latin term that means "of the same kind." This principle advises that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only those objects similar in nature to th[e] objects [specified]." *Wash. State Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003); *Yates v. United States*, 135 S. Ct. 1074, 1086

9

(2015). According to Double Down, the specific examples enumerated in the statute—"clock, tape machine, [and] slot machine"—are all "tangible machines," Def.'s Br. at 15, and as a result, any "other machine[] or device," 720 ILCS 5/28-2(a), must also be a tangible thing, rather than an internet–based app.

Double Down's reliance on the similar-nature interpretive principle does not work for a variety of reasons. To start, Double Down does not explain why it chose *tangibility* as the common thread that ties together a clock, a tape machine, and a slot machine. In other words, for this list of gambling devices, why is the "nature" in the "similar in nature" interpretive principle, *Yates*, 135 S. Ct. at 1086, tangibility? If you were to ask a gambler what all of those items have in common, the gambler would probably say, "They're all machines or devices used for gambling." Not likely that the gambler would blurt out, "They're all tangible!" And consider this too: what if you played the beloved Sesame Street game, "One of These Things Is Not Like the Others," using the clock, tape machine, slot machine, and a slot machine displayed on a phone or computer. Ask the gambler to pick the one thing that is not like the other three. The gambler might very well first categorize together the two slot-machine entrants, and then try to figure out whether the clock or tape machine is more like the two types of slot machines.[5] The point is that the similar-nature interpretive principle does not yield "tangibility" as the common thread.

---

[5]Double Down also does not explain what a "clock" or "tape machine" is in the context of gambling devices. The Court did not find an answer on "tape machine." But the reference to "clock" is likely a "stock clock." *See State v. Grimes*, 52 N.W. 42, 42 (Minn. 1892) (a "machine … wound up with a crank; that when wound up, weights suspended on cords furnished the motive power; that it had a spout, in which cards were placed, each card marked so as to represent a particular kind of railroad or other stock; that the

Another crucial point is that, although Illinois courts have yet to specifically address whether internet games are gambling devices, the Illinois Supreme Court has taken a broad view of what is a "gambling device." *E.g.*, *People v. McDonald*, 186 N.E.2d 303, 305 (Ill. 1962) (rejecting the contention that the term "gambling device" includes only "machines or mechanical devices," and instead holding that "[u]nder the broad meanings which attach to the term 'gambling device,'" the term also encompasses "inanimate," "nonmechanical" objects such as "punch boards, poker games, tips and tickets"). When interpreting the term in *McDonald*, the Illinois Supreme Court focused not on the type of device, but rather on whether the device was clearly "intended to be used as [a] device[ ] upon which money [could] be hazarded, won or lost." *Id.* at 306. Applying this line of reasoning to this case, there is no reason why the term "gambling device" could not also be viewed as embracing supposedly "intangible" online casino games if those games are clearly intended to be used as a way for consumers to bet, win, or lose money. "The law is not required to be blind to, or ineffectual against, the ceaseless efforts and ingenuity of persons to circumvent the Gambling Device Act [the Illinois Loss Recovery Act's predecessor]." *People v. One Mach. Known as "Circus Days"*, 163 N.E.2d 223, 228

---

'customer' would 'invest' a sum of money in some 'stock' represented by a particular card by purchasing a ticket from the owner of the machine, that the 'clock' was then set in motion by pulling a cord, when two of the cards in the spout would, by the motion of the machine, be dropped or forced out of the spout through two slots, one of the cards dropping through the upper and the other through the lower slot. If the card representing the 'stock' in which the 'customer' had invested was forced through the upper slot, then the stock 'had risen,' and he had won a sum equal to one half of the amount he had invested; while, if the card dropped through the lower slot, the stock had fallen,' and the customer had lost a like amount. In short, the customer was betting on which way the clock would force a particular card, and this depended entirely on chance.").

(Ill. App. 1960). So, although it is true that the internet is not a tangible device in the exact same way that a stand-alone slot machine is, the internet is also not some amorphous thing, and Double Down's app can qualify as a "device" used for gambling. No doubt the internet was not on the minds of the Illinois state legislature (or anyone else's minds, for that matter) when it passed the Illinois Loss Recovery Act (the predecessor statute was passed in 1895), but the words used in the statute are broad enough to cover Double Down's app.

Double Down next argues that its online games are not "gambling devices" because its virtual chips are not "thing[s] of value." Def.'s Br. at 12. Double Down contends that because players are only able to wager chips on the games, which are not "thing[s] of value," its online games cannot be considered "gambling devices." *Id.* (Remember, the Illinois Loss Recovery Act defines a gambling device as: "any clock, tape machine, slot machine, or other machines or device for the reception of money or *other thing of value*" that on "chance or skill … is staked, hazarded, bet, won or lost." 720 ILCS 5/28-2(a) (emphasis added).) Phillips disagrees, arguing that Double Down's chips are things of value. R. 36-1, Pl.'s Resp. Br. at 6-9. She points to the fact that the chips can be purchased by players for a discrete sum, that chips grant players the right to place additional wagers on casino games without spending any additional money, that Double Down makes millions of dollars on chip sales each year, and that players can buy and sell their accounts (and with it their chips) on the secondary market. *Id.* at 7-9; Am. Compl. ¶¶ 52, 64.

12

Phillips's argument has surface appeal. When the players buy the chips, obviously the chips have a monetary value, and obviously Double Down has made money (indeed, millions of dollars) on chip sales over the past several years. At the end of the day, however, the Court need not decide whether the chips are "things of value," because the real problem for Phillips is that Double Down's online casino games do not have a "loser" or a "winner," as those terms are used in the Illinois Loss Recovery Act. That is the next issue up for discussion.

### ii. No "Winner" or "Loser"

The statutory language of Section 5/28-8 of the Illinois Loss Recovery Act, as well as the case law, make clear that in order for a plaintiff to recover under the Act, there must be a "winner." It is against the winner that a plaintiff is entitled to recover his or her gambling losses. 720 ILCS 5/28-8 ("Any person who by gambling shall lose to any other person, any sum of money or thing of value, … may sue for and recover the money or other thing of value, so lost … in a civil action *against the winner …*." (emphasis added)); *Pearce v. Foote*, 113 Ill. 228, 237-38 (1885) (addressing whether defendant was a winner under predecessor statute); *Reuter v. Mastercard Int'l, Inc.*, 921 N.E.2d 1205, 1214-16 (Ill. App. Ct. 2010); *Ranney v. Flinn*, 60 Ill. App. 104, 104 (Ill. App. Ct. 1894) ("It is the winner … who is liable to respond to the loser … ."). Under the statute, a winner is "a person whom a player had played with and lost to." *Sonnenberg v. Amaya Grp. Hldgs. (IOM) Ltd.*, 810 F.3d 509, 510 (7th Cir. 2016). To be a winner, a person must have "a direct stake in

the outcome of the gambling." *Fahrner v. Tiltware LLC*, 2015 WL 1379347, at *7 (S.D. Ill. Mar. 24, 2015) (citing *Pearce v. Foote*, 113 Ill. 228 (Ill. 1885)).

Here, Double Down is not a "winner." Double Down never directly participated in the games, *Reuter*, 921 N.E.2d at 1215, nor did it have a direct stake in the outcome of any games. Because Double Down keeps the money a player pays to buy additional chips no matter whether that player wins or loses in the games, that money is never put at risk. Simply put, once the chips are paid for, there is no way for Double Down to lose that money. *See Langone v. Kaiser*, 2013 WL 5567857, at *6-7 (N.D. Ill. Oct. 9, 2013) (holding that the operator of website that charged entry fees was not a winner under the Illinois Loss Recovery Act because the operator never put its fees at risk); *cf. Pearce v. Foote*, 113 Ill. 228, 239 (Ill. 1885) (holding that brokers were winners because they participated in the risk of the trade). Of course, it is true—as Phillips suggests—that if a player wins additional chips, then Double Down might lose out on the chance to sell more chips to that player, assuming that the player would even choose to buy more chips if he or she ran out (which that player might opt *not* to do). Pl.'s Resp. Br. at 15. But that tangential risk does not change the result here. *See Reuter*, 921 N.E.2d at 1214 (holding that credit card companies were not winners under the statute even though the amount charged to a credit card, and the amount of interest collected by the credit card company, rested in part on the outcome of a cardholder's online gambling). Double Down still never puts any of its *own* money at risk in the online games, and risking *potential* future sales is not the same thing. Because no amount

14

of earned money ever hangs in the balance or depends on the outcome of a game, Double Down is not a "winner" under the Illinois Loss Recovery Act. *Reuter*, 921 N.E.2d at 1215; *see also Manning v. Creative Headquarters*, No. 1:11-CV-02203, at 3 (N.D. Ill. Mar. 30, 2012) (Docket Entry 83) (holding in *qui tam* action that a penny auction site was not a winner under the Illinois Loss Recovery Act (or under similar statutes) because auction participants paid entry and bidding fees regardless of the outcome of an auction).

To resist this conclusion, Phillips also argues that Double Down directly participates in the wagers because of "the way Double Down realizes its revenue." Pl.'s Resp. Br. at 13. Phillips contends that because Double Down "refuses to assign revenue generated from the sale of the Chips [in its annual public filings] until a user actually wagers and loses them in the Casino games," Double Down directly participates in each game—and thus wins when Phillips loses. *Id.* at 13-14. Phillips, however, misunderstands what it means to defer revenue. IGT (Double Down's parent company) notes in its 10-K that its "revenues" from Double Down "include deferral adjustments based on the estimated period of service or chip consumption." IGT Form 10-K at 7. All this means, however, is that Double Down does not *recognize* its chip revenue immediately upon sale; rather, it recognizes revenue once the chips are "estimated" to have been consumed. *Id.* at 64 ("Revenues from player purchases are recognized ratably over the estimated average service period in which the chips are consumed based on historical data analysis."). The fact that for *accounting* purposes Double Down does not immediately recognize the sale of its

15

chips in the fiscal period in which a player paid for those chips does not change the fact that Double Down still *never* faces the possibility of losing that money. No matter when Double Down accounts for that money, it is Double Down's to keep. Even if a player never wagers the chips he or she bought, Double Down still keeps the money paid to buy the chips. There is no "winning" money or anything of value for Double Down when the chips are used.

Finally, Phillips is likewise not a "loser" under the statute. When Phillips bought more chips, she was in essence buying the right to continue playing the games. And Phillips got to do just that: she got to use those chips to continue playing Double Down's online casino games. In other words, she did not "lose" the value of those chips. *See, e.g.*, *Humphrey v. Viacom, Inc.*, 2007 WL 1797648, at *10 (D.N.J. June 20, 2007) (dismissing *qui tam* claim under the Illinois Loss Recovery Act (among others), in part because, "in paying for the right to participate in the [fantasy sports] leagues and receive Defendants' services, participants simply do not 'lose' anything, and certainly suffer no cognizable 'gambling' loss[.]"). In the absence of a winner or a loser, Counts 1 and 2 must fail.

### iii. Pleading of Amount of Loss

Double Down separately contends that Phillips failed to adequately plead the amount of loss. For the sake of completeness, the Court will address this argument. Assuming (contrary to what the Court just held above) for the moment that using the chips should be considered a "loss" under the Illinois Loss Recovery Act, Phillips would have adequately pled the amount of loss. To plead the amount of loss under

16

Section 5/28-8(a), a plaintiff must "identify the winner, the amount lost to that winner, and the date of the loss." *Langone*, 2013 WL 5567587, at *4, 8 n.5; *see also Sonnenberg v. Oldford Grp. Ltd.*, 2015 WL 1379505, at *5 (S.D. Ill. Mar. 24, 2015), *aff'd* 810 F.3d 509 (7th Cir. 2016). A plaintiff must also plead that the loss was more than fifty dollars and that the loss happened within six months of the filing of the complaint. 720 ILCS 5/28-8(a); *Holland v. Swain*, 94 Ill. 154, 157 (Ill. 1905) (an action to recover money lost gambling must be brought within six months); *Gibb v. Dominy*, 154 Ill. App. 74, 78-79 (Ill. App. Ct. 1910).

Here, if using the chips were considered a loss under the Act, Phillips adequately pled the details of the loss. In her Complaint, Phillips alleges that she lost at least $1,000 between January 2013 and April 2015 to Double Down.[6] Am. Compl. ¶ 39. She further alleges that on March 7, 2015, she purchased $59 worth of chips (or 35 million chips) from Double Down, and that she then lost those chips. *Id.* That is enough to adequately allege that Phillips lost at least $50 to Double Down within the six months leading up to the filing of her original complaint in April 2015. Whether Phillips is entitled to recover for losses that occurred more than six months before the filing of her complaint is a separate question, and one that relates to Double Down's final argument below.

### iv. Duplicative Counts

Lastly, Double Down argues that Counts 1 and 2 of the Complaint are duplicative. Def.'s Br. at 17. But this argument, like the prior one, misses the mark.

---

[6]Phillips filed her initial complaint in state court on April 10, 2015. *See* R. 1, Notice of Removal, Exh. 1 at 2. She filed her First Amended Complaint on July 2, 2015. R. 18.

It is Phillips's contention that Double Down's Casino offers "continuous gambling sessions," and that unlike "previous gambling devices where[ ] consumers gamble and exit after some time to conclude one gambling transaction," a session at Double Down Casino lasts until a player cashes out their account (presumably, on the secondary market). Am. Compl. ¶¶ 33, 55; Pl.'s Resp. Br. at 19. Under this theory, which is detailed in Count 1 of the Complaint, Phillips contends that she should be entitled to recover losses extending beyond the six-month period immediately preceding the filing of this action. More specifically, Phillips argues that she should be entitled to recover losses dating all the way back to January 2013 (the date she started playing Double Down's casino games), because her play has constituted a single, continuous gambling session. Am. Compl. ¶¶ 48-59; Pl.'s Resp. Br. at 19.

In Count 2, by contrast, Phillips bases her claim on the theory she is instead entitled to recover *only* those losses that occurred in the six months immediately preceding the filing of this action, and nothing more. Am. Compl. ¶¶ 60-70; Pl.'s Resp. Br. at 19. Phillips raises this claim *in the alternative*, something she clearly states in her complaint. Am. Compl. ¶¶ 60-70 (Second Cause of Action labeled as being "In the Alternative to the First Cause of Action"). Phillips had every right to raise this claim in the alternative. *Carlson v. Nielsen*, 2014 WL 4771669, at *3 (N.D. Ill. Sept. 24, 2014) (a party "may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones"); *Alper v. Altheimer & Gray*, 257 F.3d 680, 687 (7th Cir. 2001) (explaining that at the motion to dismiss stage, a "[plaintiff] is entitled to plead in the alternative,

18

even if the pleadings are inconsistent"); Fed. R. Civ. P. 8(d)(2). Counts 1 and 2, which are based on different legal theories, are not duplicative. Still, as discussed earlier, Counts 1 and 2 must be dismissed, because Double Down is not a winner, nor is Phillips a loser under the Illinois Loss Recovery Act.

### B. Count 3: Illinois Consumer Fraud and Deceptive Practices Act

In Count 3, Phillips contends that Double Down's gambling devices violate the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*. Phillips alleges that Double Down treated her "unfair[ly]" and that Double Down's games "offend[ ] Illinois'[s] public policy against unlawful gambling and [are] … unethical, oppressive, [and] unscrupulous." Am. Compl. ¶ 78.

Illinois's Consumer Fraud Act is designed "to protect consumers from unfair methods of competition and other unfair and deceptive business practices." *Batson v. Live Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) (citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). "A plaintiff is entitled to recover under [the Act] when there is unfair or deceptive conduct." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010); *Robinson*, 775 N.E.2d at 960. Here, Phillips alleges only that Double Down engaged in "unfair" conduct; Phillips does not allege that Double Down engaged in deceptive conduct.

In determining whether particular conduct is unfair, the Court considers whether the conduct: "(1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." *Batson*, 746 F.3d at 830; *Robinson*, 775 N.E.2d at 961. A plaintiff need not satisfy all three criteria to

support a finding of unfairness. *Robinson*, 775 N.E.2d at 961. Rather, "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* So, Phillips's claim must satisfy at least one of these criteria to be valid. *Batson*, 746 F.3d at 830.

Phillips first argues that Double Down's games offend Illinois's public policy against unlawful and unregulated gambling. A practice offends Illinois public policy if it is contrary to what "is found in [Illinois's] constitution, its statutes, and its judicial decisions." *Reed v. Farmers Ins. Grp.*, 720 N.E.2d 1052, 1057 (Ill. 1999). As discussed above, Illinois does prohibit the use of gambling devices under its Loss Recovery Act, but, as the Court has already explained, Double Down's online games do not violate that statute. Because Phillips's claim here is premised on Double Down's games violating that statute, which they do not, Double Down's games do not violate Illinois's public policy.

Phillips next argues that Double Down's games are "immoral" and "otherwise unethical, oppressive, [and] unscrupulous," because they are designed to encourage illegal gambling and to exploit the psychological triggers associated with gambling and addiction. Am. Compl. ¶ 78. To satisfy this criterion, a plaintiff must establish that the defendant's conduct is "so oppressive [that it] leave[s] the consumer with little alternative except to submit to it." *Robinson*, 775 N.E.2d at 961; *Batson*, 746 F.3d at 833. This criterion is *not* satisfied, however, "if a consumer can avoid the defendant's practice by seeking an alternative elsewhere." *Batson*, 746 F.3d at 833; *see also Robinson*, 775 N.E.2d at 961; *Siegel*, 612 F.3d at 936. Here, Phillips does

not allege that she had no choice but to submit to Double Down's online games, nor could she. Phillips could have picked other forms of entertainment, or even sought to play online games on a different platform or website. There was no lack of meaningful choice here. And while gambling may be considered "immoral," Pl.'s Resp. Br. at 21 (citing *Modernistic Candies v. Fed. Trade Comm'n*, 145 F.2d 454, 455 (7th Cir. 1944)), it has already been established that Double Down's games do not have a gambling winner or loser under Illinois law. Phillips has failed to satisfy this criterion.

Phillips also contends that Double Down's conduct of inducing consumers to buy chips caused substantial injury. She argues that she personally suffered a substantial economic injury of more than $1,000 as a result of Double Down's conduct. Am. Compl. ¶¶ 39, 79; Pl.'s Resp. Br. at 21. She further alleges that when her injuries are combined with the losses suffered by the "public as a whole," "they are undeniably substantial." Pl.'s Resp. Br. at 21. A practice causes substantial injury "if the injury is (1) substantial; (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) one that consumers themselves could not reasonably have avoided." *Batson*, 746 F.3d at 834. Here, Phillips has failed to show that she could not have reasonably avoided buying additional virtual chips. She could have avoided the cost of buying more chips by either opting for alternative entertainment when she ran out of chips, or by stopping play and waiting a day for an additional allotment of free chips. *E.g.*, *Kremers v. Coca-Cola Co.*, 712 F. Supp. 2d 759, 773 (S.D. Ill. 2010) (holding that the

injuries caused by defendant's trade practices, if any, is one that plaintiff could have easily avoided by simply drinking a different soft drink or beverage). The ICFA claim in Count 3 must be dismissed.

### C. Count 4: Unjust Enrichment

Finally, in Count 4, Phillips raises an unjust enrichment claim. In Illinois, to state a claim based on a theory of unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989); *see also Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). But where "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment [claim] will be tied to th[at] related claim [and] … will stand or fall with the related claim." *Cleary*, 656 F.3d at 517; *see also Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009) (a claim of unjust enrichment "is not a separate cause of action that, standing alone, will justify an action for recovery").

Here, Phillips's unjust enrichment claim is based on the same allegedly improper conduct that her Illinois Loss Recovery Act claims (Counts 1 and 2) and Illinois Consumer Fraud and Deceptive Practices Act claim (Count 3) are based on, namely, that Double Down Casino allegedly operates unlawful gambling devices. But those claims have been rejected. Because Phillips's unjust enrichment claim

22

rests on the same conduct alleged in Phillips's first three counts—all of which have already been found invalid—Phillips's unjust enrichment claim must also be dismissed. *Cleary*, 656 F.3d at 517.

## IV. Conclusion

For the reasons discussed above, Double Down's motion to dismiss [R. 24] is granted. Phillips has already amended her complaint once, and does not propose any other potential amendments, so the dismissal is with prejudice.

ENTERED:

‾‾‾‾‾‾s/Edmond E. Chang‾‾‾‾‾‾
Honorable Edmond E. Chang
United States District Judge

DATE: March 25, 2016